STATE OF CONNECTICUT *v.* TERRANCE
STEVENSON
(AC 18159)

O'Connell, C. J., and Landau and Daly, Js.

Argued December 14, 1998—officially released June 1, 1999

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, senior assistant state's attorney, with whom were *Michael A. Pepper*, assistant

state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Terrance Stevenson, appeals from the judgment of conviction, rendered after a jury trial, of murder as an accessory in violation of General Statutes §§ 53a-54a (a)[1] and 53a-8,[2] and conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a).[3] On appeal, the defendant claims that the trial court improperly (1) refused to admit into evidence a witness' prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), (2) denied the defendant's motion for a mistrial which he based on prosecutorial comments that allegedly shifted the burden of proof to the defendant, (3) admitted evidence of prior uncharged misconduct that was more prejudicial than probative concerning a prior occasion in which the defendant was armed, and (4) failed to instruct the jury regarding the credibility of the witnesses and that it could make its own determination as to the authenticity of a letter. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On March 21, 1994, Jeffrey Dolphin became

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

involved in a dispute with James Baker and the defendant over a lost quantity of cocaine. At some point during this dispute, Baker, Dolphin and the defendant were joined by Jermaine Harris, also known as "Chico," and Trent Butler. While Dolphin maintained that a third party lost the cocaine, the defendant blamed Dolphin for the missing cocaine and pulled a gun on him.

Thereafter, Baker asked, "Why don't we make this motherfucker do it?" The defendant pointed the gun at Dolphin again and forced him into the back of an old white station wagon driven by Baker. Butler, Harris and the defendant were also in the car. Butler then told Dolphin that they wanted him to shoot somebody to make up for the money that he had lost, which Dolphin refused to do.

Upon Dolphin's refusal, Harris stated that he would shoot the victim, Amenophis Morris. At that point, Baker parked the vehicle on Exchange Street in New Haven, about one-half block from the victim's home. Harris got out of the car, put on a mask and walked to the victim's home accompanied by the defendant, while the others remained behind. Both of the men were armed. Dolphin then heard nine or ten gunshots from the direction of the victim's home, although he could not see who was shooting. When Harris and the defendant returned to the vehicle, Harris shouted, "I got him!" The victim had been shot to death as he sat on his front porch eating dinner.

When the men let Dolphin out on another street, they threatened him and told him not to say anything about what had happened. Approximately one month after the homicide, the New Haven police department arrested Dolphin on unrelated narcotics charges. While in custody, Dolphin provided the police with information implicating Baker, Butler and Harris in the homicide. Dolphin did not give the police the defendant's name

or his street name, "Joe the Flea." The following day, Dolphin made a photographic identification of Harris.

In February, 1995, in a tape-recorded statement, Dolphin informed Butler's attorney, Leo Ahern, that the information he had told the police was false. Thereafter, in early March, 1995, in another conversation with the New Haven police, Dolphin made photographic identifications of Butler and Baker. At that time, Dolphin stated to the police that he did not recognize anyone else in the array of photographs, including the defendant. In September, 1995, Dolphin informed the state's attorney's office that the statement that he made to Ahern was false. It was not until October 31, 1995, that Dolphin informed the police that the fourth individual involved in the homicide was "Joe the Flea," and that his real name was Terrance Stevenson, the defendant.

The defendant was subsequently arrested and, following a jury trial, he was convicted on both counts. This appeal followed. Other facts will be discussed where relevant to issues in this case.

I

The defendant first claims that the trial court improperly refused to admit into evidence a witness' prior inconsistent statement that would have undermined the witness' credibility. Specifically, the defendant argues that the trial court improperly (1) refused to admit into evidence a tape-recorded statement of the state's key witness, Dolphin, (a) for substantive and impeachment purposes and (b) with Ahern's testimony to show Dolphin's demeanor during the statement, and (2) exercised its discretion in refusing to grant the defendant a continuance to subpoena Dolphin as his own witness. We are not persuaded.

The following additional facts and procedural history are necessary for the resolution of these claims. In his

tape-recorded conversation (statement) with Ahern in February, 1995, Dolphin recanted the account of the murder that he previously had given to the New Haven police. On direct examination, however, Dolphin testified that he lied to Ahern because he was being threatened while he was incarcerated with Baker, Butler and Harris. In addition, Dolphin testified that in return for the statement that he gave to Ahern, Butler promised that he would attempt to get Dolphin assistance with his bond or attempt to get Ahern to represent him on the unrelated narcotics charges.

During cross-examination, the defendant questioned Dolphin regarding additional details about the tape-recorded statement.[4] Dolphin testified that he did not think that he would get in trouble for giving Ahern a statement that was at complete odds with the statement that he had given the police because he did not perjure himself, as the statement was not a sworn statement.

Three days later, just before the state rested, defense counsel made an offer of proof with regard to calling Ahern as a witness. Specifically, defense counsel stated that it was his intention to have Ahern testify as to Dolphin's demeanor during the February, 1995 statement. Defense counsel also stated that he intended to introduce the tape-recorded statement through Ahern for both substantive purposes and to show demeanor.

---

[4] Specifically, on cross-examination, Dolphin admitted telling Ahern that (1) he was not present during the shooting, (2) he had never been in the Fair Haven section in the company of the individuals that he named, (3) he spent the entire afternoon and evening, up until 11 p.m., of March 21, 1994, arguing with Butler, Baker and Harris in the downtown section of George and Winthrop Streets, about one to two miles away from the scene of the shooting, (4) he first learned about the homicide from reading about it in the newspaper the following day and that he learned details about the shooting from people on the street and (5) he falsely implicated Butler, Baker and Harris because he wanted to get out of jail and wanted to get revenge because of a dispute that he had with the other individuals over misplaced money.

The trial court sustained the state's objection to the admission of the tape, noting that Dolphin had admitted that the statement given to Ahern was false and that the specific portions of the statement about which he was questioned on cross-examination were false.[5] The trial court concluded that admitting the entire tape-recorded statement would be cumulative of those areas that were addressed on cross-examination. Furthermore, the trial court refused to admit the statement under *State* v. *Whelan*, supra, 200 Conn. 752, ruling that it was unreliable. The court concluded that the statement was unreliable because it was motivated by threats, was made at a correctional center to an attorney representing a person who had threatened Dolphin and was not made under oath, and because Dolphin testified that he understood that he was not perjuring himself by making the statement to Ahern. Accordingly, the trial court refused to admit the tape-recorded statement into evidence for the purpose of showing demeanor or as substantive evidence of the facts stated therein. Finally, the trial court concluded that Dolphin had admitted that his prior statements were inconsistent and, therefore, the statement would be cumulative for the purpose of showing inconsistency.

Thereafter, the trial court denied the defendant's request that he be allowed to call Ahern as a witness to testify as to Dolphin's demeanor during the February, 1995 interview. The defendant then moved for a continuance to subpoena Dolphin to testify as his own witness.[6] The defendant indicated that the purpose of recalling Dolphin was to attain a more thorough examination of his testimony with regard to the various matters discussed in the February, 1995 statement. The trial court also denied that request.

[5] See footnote 4.

[6] At the time of trial, Dolphin was a college student residing out of state.

Our review of evidentiary rulings is limited. Evidentiary "rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Hoth*, 50 Conn. App. 77, 87–88, 718 A.2d 28, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

## A

The defendant claims that the trial court improperly refused to admit into evidence Dolphin's tape-recorded statement to Ahern (1) for substantive and impeachment purposes and (2) with Ahern's testimony to show Dolphin's demeanor during the statement. We do not agree.

## 1

In his initial claim, the defendant argues that the trial court improperly excluded Dolphin's tape-recorded statement, which indicated that the statement that he gave to the police was false. Specifically, the defendant argues that Dolphin's tape-recorded statement constitutes a prior inconsistent statement and should have been admitted for both impeachment and substantive purposes under *State* v. *Whelan*, supra, 200 Conn. 743. The defendant argues that all of the conditions for admitting prior inconsistent statements under *Whelan* were satisfied; Dolphin's statement to Ahern was reliable, whereas his original statement to the police was unreliable, and the evidence was not cumulative.

"*Whelan* stands for the proposition that a prior inconsistent statement may be used at trial for substantive

as well as impeachment purposes where the statement is signed by a declarant who has personal knowledge of the facts stated therein and who testifies at trial and is subject to cross-examination." *State* v. *Carmon*, 47 Conn. App. 813, 821 n.4, 709 A.2d 7, cert. denied, 244 Conn. 918, 714 A.2d 7 (1998). To be admissible under the *Whelan* exception to the hearsay rule, "a prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness." *State* v. *Davis*, 32 Conn. App. 21, 38, 628 A.2d 11 (1993). Under *Whelan*, the trial court must weigh the reliability of each statement on a case-by-case basis. Id.

Despite the fact that Dolphin's statement met the criteria set forth in *Whelan*,[7] we conclude on our review of the record that the trial court properly determined that Dolphin's prior statement lacked sufficient reliability to permit its admission for substantive purposes. On cross-examination, Dolphin recanted the statement that he made to Ahern. He testified that the statement was given to Butler's attorney at the correctional center where he was incarcerated with Butler, Baker and Harris, that he was being threatened by Butler, Baker and Harris to lie about what happened the night of the shooting, and that Butler promised him that he would help him with his bond or have Ahern represent him in his narcotics case. Dolphin also testified that he made the statement because he wanted revenge because of the dispute that he had with Butler, Baker and Harris on the day of the shooting. Furthermore, although Dolphin

[7] In dicta, *State* v. *Whelan*, supra, 200 Conn. 754 n.9, the court noted that "prior tape recorded statements possess similar indicia of reliability and trustworthiness to allow their substantive admissibility as well." "This dicta became controlling law in later cases. See *State* v. *Woodson*, 227 Conn. 1, 21, 629 A.2d 386 (1993); *State* v. *Alvarez*, 216 Conn. 301, 313, 579 A.2d 515 (1990)." *State* v. *Hermann*, 38 Conn. App. 56, 67–68, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995). The fact that this is not a written statement, therefore, does not preclude its *potential* admission for substantive use.

was aware that he had already given the police a sworn statement, he was not afraid of perjuring himself because he was not giving the statement to Ahern under oath. Our review of the statement reveals that Ahern did not issue Dolphin any warning about giving false information. See *State* v. *Newsome*, 238 Conn. 588, 599–600, 682 A.2d 972 (1996) (while not necessary for statement to be sworn, oath adds to reliability of statement).

Dolphin's statement to Ahern was given under circumstances that raised a question for the court to determine regarding the statement's reliability. This court cannot, on the basis of a printed record, substitute its own evaluation of Dolphin's credibility in place of the trial court's evaluation. See *State* v. *McDougal*, 241 Conn. 502, 510, 699 A.2d 872 (1997).

Moreover, the defendant was afforded the opportunity while cross-examining Dolphin to explore all the details in the statement. Instead, the defendant made no attempt to introduce the statement through Dolphin, did not request that the jury be allowed to make substantive use of the statement at that time and did not question Dolphin about each and every detail of the statement. "The extent of cross-examination . . . at a trial, is a trial tactic"; *State* v. *Crump*, 43 Conn. App. 252, 265, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996); which we do not second guess. *Ostolaza* v. *Warden*, 26 Conn. App. 758, 777, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992). It was ultimately for the trial court, who observed Dolphin testify, to determine whether the statement should be admitted.[8] We conclude, therefore, that under the facts

---

[8] Furthermore, even if we were to assume that the trial court's evidentiary ruling was improper, we are not convinced that the defendant has shown that he was harmed by the ruling. See *State* v. *Marshall*, 246 Conn. 799, 812, 717 A.2d 1224 (1998) (appellant has burden of proving evidentiary ruling was harmful). In *State* v. *Correia*, 33 Conn. App. 457, 462, 636 A.2d 860, cert. denied, 229 Conn. 911, 642 A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130 L. Ed. 2d 174 (1994), this court held that a jury charge

and circumstances of this case, that the trial court did not abuse its discretion in refusing to admit the statement into evidence under *Whelan.*

### 2

We turn next to the question of whether the trial court improperly excluded the tape-recorded statement and Ahern's testimony to show Dolphin's demeanor during the statement.[9]

In addition to ruling that the statement was inadmissible for substantive purposes on the basis of its finding that the statement was unreliable, the trial court further stated that, "for that reason, the statement will not come in for the purpose of showing demeanor . . . ." The defendant argues that although Dolphin admitted that he was a liar, without knowing what Dolphin's demeanor was when he made the statement to Ahern, the jurors had nothing with which to compare his demeanor on the stand when he testified that the statement was false. On the basis of our review of the record

instructing the jury that it could consider the consistency of a witness' testimony was not the same as a charge that the victim's prior inconsistent statement could be used for impeachment purposes only. "Absent a limiting instruction, the jury was free to take the victim's prior inconsistent statement as true." Id., 462–63. In the present case, as in *Correia,* when instructing the jury as to the credibility of witnesses, the trial court did not issue the jury a limiting instruction that the portion of the statement about which Dolphin testified on cross-examination could be used for impeachment purposes only. As such, the jury was free to take Dolphin's prior inconsistent statement as true. See id.; see also footnote 4.

[9] The defendant claims that the trial court improperly refused to admit into evidence Ahern's testimony regarding Dolphin's demeanor during the statement. "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citation omitted; internal quotation marks omitted.) *New London Federal Savings Bank* v. *Tucciarone,* 48 Conn. App. 89, 100, 709 A.2d 14 (1998). In his brief, the defendant cites no law in support and provides no analysis of this claim. "[A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) Id., 101. We, therefore, will not review the claim.

before us, and our prior discussion regarding the statement, we are persuaded that the trial court did not abuse its discretion in refusing to admit the statement for the purpose of showing Dolphin's demeanor.[10]

B

The defendant next claims that the trial court improperly denied his request for a continuance to subpoena Dolphin as his own witness. We disagree.

" 'The trial court has a responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice.' " *State* v. *Jurgensen*, 42 Conn. App. 751, 760, 681 A.2d 981, cert. denied, 239 Conn. 931, 683 A.2d 398 (1996). " 'Once a trial has begun . . . a defendant's right to due process . . . [does not entitle] him to a continuance upon demand.' . . . Appellate review of a trial court's denial of a motion for a continuance is 'governed by an abuse of discretion standard that, although not unreviewable, affords the trial court broad discretion in matters of continuances.' " (Citations omitted.) *State* v. *Ortiz*, 40 Conn. App. 374, 385–86, 671 A.2d 389, cert. denied, 236 Conn. 916, 673 A.2d 1144 (1996). "An abuse of discretion must be proven by the appellant by showing that the denial of the continuance was unreasonable or arbitrary." *State* v. *Bradley*, 39 Conn. App. 82, 87, 663 A.2d 1100 (1995), cert. denied, 236 Conn. 901, 670 A.2d 322 (1996). The defendant must also prove that the trial

---

[10] Moreover, by arguing that the jury was deprived of the opportunity to compare Dolphin's demeanor on the stand with his demeanor during the statement, the defendant is merely attempting to bootstrap his argument that the statement should have been admitted for substantive purposes onto the argument that the statement is needed to impeach the defendant. We have already rejected the defendant's claim that the trial court abused its discretion with respect to excluding the statement for substantive purposes because it was unreliable. We will not now allow the unreliable statement into evidence under the guise of demeanor evidence.

court "substantially impaired [his] ability to defend himself." (Internal quotaion marks omitted.) *State* v. *Jurgensen,* supra, 759. "Our assessment of the reasonableness of the trial court's exercise of discretion is limited to a consideration of those factors on the record known to the court at the time it rendered a decision. . . . We must afford the trial court every reasonable presumption in favor of the proper exercise of its discretion." (Citation omitted.) *State* v. *Bradley,* supra, 87.[11]

On the day that the state rested its case-in-chief, the defendant moved for a continuance to subpoena Dolphin in order to examine him more thoroughly regarding the details of his prior inconsistent statement. The defendant made this request three days after he had cross-examined Dolphin regarding five specific portions of the statement. At the time that the defendant made the request, Dolphin resided outside the state. In his request for a continuance, the defendant failed to specify the likely length of the delay. As in *State* v. *Jurgensen,* supra, 42 Conn. App. 759, the defendant gave the trial court no assurances that this task would even be possible. The trial court reasonably could have found that this was a request for an indefinite period of time. " 'Our judicial system cannot be controlled by the litigants and cases cannot be allowed to drift

---

[11] "Our Supreme Court has identified a list of factors that courts have considered in appellate review of matters of continuances. While not an exhaustive list, 'courts have considered matters such as: the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; the likelihood that the denial would substantially impair the defendant's ability to defend himself; the availability of other, adequately equipped and prepared counsel to try the case; and the adequacy of the representation already being afforded to the defendant.' . . . *State* v. *Hamilton,* 228 Conn. 234, 240, 636 A.2d 760 (1994)." *State* v. *Coleman,* 41 Conn. App. 255, 269 n.15, 675 A.2d 887 (1996), rev'd on other grounds, 242 Conn. 523, 700 A.2d 14 (1997).

aimlessly through the system. . . . Judges must be firm and create the expectation that a case will go forward on the specific day that it is assigned.' " *State* v. *Bradley*, supra, 39 Conn. App. 87–88.

Moreover, the trial court reasonably could have found that there was no legitimate reason for the delay as the defendant had the opportunity on cross-examination thoroughly to question Dolphin about the statement. As noted above, we will not second guess the defendant's decision to question Dolphin only as to five specific statements that he made in the tape-recorded statement. See *State* v. *Crump*, supra, 43 Conn. App. 265; *Ostolaza* v. *Warden*, supra, 26 Conn. App. 777. We cannot say that the trial court's denial of the defendant's request for a continuance was either arbitrary or unreasonable. Accordingly, we conclude that the trial court did not abuse its discretion.[12]

---

[12] In addition to his evidentiary claims, the defendant also claims that because this evidence was vital to his defense, he was deprived of his due process right to a defense and of compulsory process in violation of the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. The defendant concedes that he did not raise these constitutional claims at trial but maintains that they are reviewable pursuant to *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973), *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), and Practice Book § 60-5.

We conclude that the defendant has not satisfied the second prong of *State* v. *Golding*, supra, 213 Conn. 239–40, because he has failed to demonstrate that his claims allege a violation of a fundamental right. We note, as we have done on numerous occasions, that "[r]obing garden variety claims of [an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Evidentiary claims are not of constitutional magnitude and are thus not entitled to *Golding* review." (Citations omitted; internal quotation marks omitted.) *State* v. *Gross*, 35 Conn. App. 631, 637–38, 646 A.2d 933, cert. denied, 231 Conn. 932, 649 A.2d 254 (1994). "Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). "Whether a trial court's erroneous restriction of a defendant's or defense [witness'] testimony in a criminal trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis." (Internal quotation marks omitted.) *State* v. *Fernandez*, 27 Conn. App. 73, 79, 604 A.2d 1308, cert. denied, 222 Conn. 904, 606 A.2d 1330 (1992).

## II

The defendant next claims that the trial court improperly denied his motion for a mistrial filed on the basis of allegedly improper prosecutorial comments, which he claims effectively shifted the burden of proof to him. We disagree.

The following facts are necessary for the resolution of this claim. During the state's initial summation, the prosecutor discussed the contents of a handwritten letter[13] that was received from Harris' attorney. The state did not specifically mention the testimony of James Streeter, a criminalist and questioned document examiner for the state police forensic science laboratory, which linked the letter to the defendant. During defense counsel's argument, however, he urged the jury to discount Streeter's testimony. Defense counsel, referring to Streeter's testimony, stated, "[Streeter] admitted himself that questioned document examiners can look at the same documents and come to varying conclusions, at least about the degree of certainty, as to who wrote the thing."

The defendant merely states that "because [Dolphin's statement] was relevant to prove [the] defendant's claim that Dolphin had actually lied to police in order to gain favorable treatment and because it would have established that Dolphin was an effective liar, the court erred in preventing its admission." In addition, the defendant asserts that he has the right to present his own witnesses to establish a defense. The defendant, however, makes no specific reference to the defense of which he was allegedly deprived. Furthermore, even if the defendant's defense was clearly set forth, "[t]he constitutional right to present a defense does not include the right to introduce any and all evidence claimed to support it. . . . The trial court retains the power to rule on the admissibility of evidence pursuant to traditional evidentiary standards." (Citation omitted; internal quotation marks omitted.) State v. Shabazz, 246 Conn. 746, 752–53 n.4, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999). We conclude that by excluding evidence that it found was unreliable, the trial court did not deprive the defendant of his fundamental due process right to present a defense. We also find that there was no manifest injustice and, therefore, the claims do not merit plain error review. See Practice Book § 60-5.

[13] See part IV B for a discussion of the handwritten letter.

On rebuttal, the state commented on the defendant's failure to call a handwriting expert to counter Streeter's opinion. The state also remarked that if Streeter had indicated that there was a possibility that anybody else could have written the letter, the defendant would have called Streeter as a witness.[14] At the conclusion of the arguments, the defendant moved for a mistrial on the ground that the state's remarks were "an improper attempt to shift the burden of proof." The court denied the motion.

We will review this claim because it was adequately preserved for review. "Prosecutorial misconduct may occur during closing argument. . . . The focus of our review is on the prosecutor's comments viewed in the context of the entire trial, not on the culpability of the prosecutor. . . . Moreover, we will not disturb the trial court's . . . ruling unless the challenged remarks have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . .

"When a verdict is challenged on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial. . . . The trial court's ruling is entitled to weight because of the vantage point

---

[14] Specifically, the state made the following remarks: "[Defense counsel] in closing argument also mentioned that [Streeter] admitted that two different document examiners can come up to—can come up with different conclusions. I didn't hear two different document examiners in this case. If there was another document examiner that said something else about this letter, then so be it, but I didn't hear anything from the defense side saying, well, here is a document examiner and he says different from [Streeter]. I didn't hear that. . . . [Streeter] not only makes these analysis for the prosecution and police, but he also does these analysis at the request of the public defender's office, the criminal defense office. And I didn't hear [defense counsel] mention that in his closing argument. If this letter, if that analysis by [Streeter] had pointed to anybody else, you would be sure that [defense counsel] would have called [Streeter] to the stand to show that and use [Streeter's] testimony."

from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful. . . . Therefore, the trial court's determination that the prosecutor's remarks did not require a new trial must be afforded great weight." (Citations omitted; internal quotation marks omitted.) *State* v. *Chasse*, 51 Conn. App. 345, 353, 721 A.2d 1212 (1998), cert. denied, 247 Conn. 960, 723 A.2d 816 (1999).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, we focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." *State* v. *Williams*, 41 Conn. App. 180, 190, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996).

After a review of the record, we conclude that the alleged misconduct did not deprive the defendant of due process. Examined in context, the prosecutor's comments were invited by defense counsel. The prosecutor was responding to and attempting to discredit the defendant's closing statement in which the defendant stated that Streeter admitted that document examiners could reach different conclusions about handwriting contained in a certain document. "[I]t is entirely proper for counsel to appeal to a jury's common sense in closing remarks." *State* v. *Chasse*, supra, 51 Conn. App. 361. When viewed in the context of the entire summation, the jury reasonably could have viewed the challenged remarks as an appeal to their common sense not to discredit Streeter's testimony simply because other document examiners could disagree about the handwriting.

"[T]he purpose of summations is for the attorneys to assist the jury in analyzing, evaluating and applying the evidence." (Internal quoation marks omitted.) *State* v. *Moore*, 49 Conn. App. 13, 28, 713 A.2d 859 (1998).

Furthermore, it is well established that "in addressing the jury [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 760, 574 A.2d 182 (1990). "Inherent in this latitude is the freedom to argue reasonable inferences based on the evidence presented at trial." *State* v. *Chasse*, supra, 51 Conn. App. 360.

Moreover, the challenged conduct was isolated and confined to closing arguments and, therefore, by definition could not have been the culmination of an improper theme developed during the trial. See *State* v. *Pouncey*, 40 Conn. App. 624, 636, 673 A.2d 547 (1996), aff'd, 241 Conn. 802, 699 A.2d 901 (1997). There is no evidence in the record before us that the prosecutor attempted to "hammer home" his point to the jury. See *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983). Furthermore, the state had a strong case against the defendant: Dolphin's testimony, even though he was impeached by his prior inconsistent statement, detailed the events that transpired that evening, and his testimony was corroborated by Sharon Reed, Baker's girlfriend at the time of the homicide, the handwritten letter and scientific evidence regarding the trajectory of the bullets.

In addition, the trial court instructed the jury as to the defendant's presumption of innocence, its responsibility to consider all of the evidence in reaching a decision and, most important, the *state's* burden to prove each element of the crime charged beyond a reasonable

doubt. The trial court also charged the jury that it must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant as having committed the crime. Because "we presume, absent a fair indication to the contrary, that the jury followed the instruction of the court as to the law"; *State* v. *Lasky*, 43 Conn. App. 619, 629, 685 A.2d 336 (1996), cert. denied, 239 Conn. 959, 688 A.2d 328 (1997); we conclude that the burden of proof properly remained on the state to prove each and every element of the crimes beyond a reasonable doubt.

Viewing the remark in the context of the entire summation; *State* v. *Chasse*, supra, 51 Conn. App. 359; we conclude that the prosecutor's remarks were not improper and, therefore, did not deprive the defendant of his constitutional right to a fair trial.[15]

### III

The defendant next argues that the trial court improperly admitted evidence of uncharged misconduct that was more prejudicial than probative concerning another occasion on which the defendant was armed. Specifically, the defendant argues that the uncharged misconduct evidence allowed the jury to speculate that the defendant, being in possession of a handgun, must naturally have been the victim's shooter. We are not persuaded.

---

[15] In support of his claim, the defendant relies on *State* v. *Williams*, supra, 41 Conn. App. 186–87. The defendant's reliance on *Williams*, however, is misplaced. In *Williams*, the prosecutor *repeatedly* maintained that the defendant purposefully and selectively showed unclear photographs to the jury because he did not have better evidence to support his alibi. This court held that the prosecutor improperly attempted to distort the state's burden of proof and to allocate the burden of proof to the defendant. Id., 187. In sharp contrast, in the present case, the prosecutor did not repeatedly engage in any misconduct. The prosecutor's remarks were isolated and made in response to the defendant's challenge to Streeter's testimony and, arguably, were made to rehabilitate his credibility.

The following facts are necessary for the resolution of this claim. The defendant filed a motion in limine seeking to preclude the state from eliciting from Reed that two or three weeks after the homicide, she saw Baker, Butler, Harris and the defendant flee through her apartment upon seeing a police vehicle, that the defendant and Butler possessed handguns at that time and that Baker possessed and kept a nine millimeter handgun in her apartment. The defendant objected to Reed's testimony regarding the possession of handguns on the basis of relevancy, as there was nothing connecting the gun with the crime charged, and that it was highly prejudicial. In response, the state argued that the evidence of the handguns was relevant to show that the defendant and the others had access to the type of weapon used in the homicide. The state also argued that further testimony would reveal that a nine millimeter shell casing entered into evidence came from a handgun as opposed to some other type of gun. The trial court asked the state, "what precisely do you expect the evidence to be [with respect to the guns]?" The prosecutor stated that he expected Reed to say that they were handguns.

Thereafter, the trial court admitted only the portion of Reed's testimony regarding the fact that Butler and the defendant had handguns. Reed testified that Baker kept a nine millimeter handgun in her apartment. She also testified that, on one occasion after the homicide, she saw Baker, Butler, Harris and the defendant near her apartment and that the defendant and Butler were armed with handguns.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible. . . . The rationale of [the rule preventing evidence of guilt of other crimes] is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now

charged. . . . We have, however, recognized exceptions to the general rule if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . [Prior misconduct] evidence may also be used to corroborate crucial prosecution testimony. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant . . . to at least one of the . . . exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the . . . evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Vega*, 48 Conn. App. 178, 189–90, 709 A.2d 28 (1998).

We first examine the relevancy of the evidence. "Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997). In ruling on the admissibility and relevancy of evidence, the trial court has broad discretion. Id. "The degree to which any evidence is material and relevant must be assessed in light of the fact or issue that it was intended to prove." (Internal quotation marks omitted.) *State* v. *Vega*, supra, 48 Conn. App. 191.

In the present case, our review of the record persuades us that the trial court did not abuse its discretion when it determined that evidence regarding a handgun was relevant to this case. The trial testimony indicated that the victim was killed by a gun and that ballistic testing revealed that shell casings recovered by police had been fired from a nine millimeter semiautomatic handgun. The prosecutor sought to introduce Reed's testimony to show that the defendant and the others

had access to the type of weapon that was used to kill the victim. "Evidence indicating that an accused possessed an article with which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime. . . . The state does not have to connect a weapon directly to the defendant and the crime. It is necessary only that the weapon be suitable for the commission of the offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Sivri*, 46 Conn. App. 578, 584, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997).

In *Sivri*, we held that the evidence that the defendant was in possession of guns and amunition three days after the disappearance of the victim permitted the jury to infer that the defendant had possessed the guns three days earlier. Id., 585. In the present case, Reed testified that "sometime after" the victim's death,[16] she saw the defendant and the other individuals near her apartment and that the defendant and Baker had handguns. Although the span of time between the victim's death and Reed's observation of the handguns is more than the three days discussed in *Sivri*, we are sufficiently persuaded that the evidence of the defendant's possession of a handgun that was suitable for the commission of the crime had a tendency to support a relevant fact. We conclude that the trial court did not abuse its discretion in concluding that Reed's testimony was relevant.

"When relevant evidence of other crimes is offered, the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling upon its admissibility. . . . Because of the difficulties inherent in this balancing process, we will uphold the

---

[16] Our review of the transcript reveals that the period of time apparently referred to by the state in its examination of Reed was sometime between March and April, 1994.

trial court's ruling on the admission of uncharged misconduct evidence unless there is a manifest abuse of discretion or an injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Vega,* supra, 48 Conn. App. 191. The defendant has not demonstrated an abuse of discretion or that the admission of Reed's testimony caused him an injustice. We conclude that the trial court's ruling was well within its discretion.

## IV

The defendant finally claims that the trial court improperly (1) instructed the jury regarding the credibility of witnesses and (2) failed to instruct the jury that it could make its own determination as to the authenticity of a letter. We conclude that the trial court's instructions were proper.

"The standard of review of jury instructions is well settled. A charge to the jury is not to be critically dissected nor are individual instructions to be judged in artificial isolation from the overall charge. . . . In reviewing a challenge to jury instructions, we must examine the charge in its entirety. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury. . . . The court is under no duty at any time to charge in the exact language requested. . . . Failure to charge precisely as proposed by a [party] is not error where the point is fairly covered in the charge." (Citation omitted; internal quotation marks omitted.) *State* v. *Middlebrook,* 51 Conn. App. 711, 728–29, 725 A.2d 351, cert. denied, 248 Conn. 910, 731 A.2d 310 (1999).

In reviewing this claim, we are mindful that "[t]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury

in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *State* v. *Orhan*, 52 Conn. App. 231, 252, 726 A.2d 629 (1999). Moreover, "[a]n error in instructions in a criminal case is reversible error when it is shown that it is reasonably *possible* for errors of constitutional dimension or reasonably *probable* for nonconstitutional errors that the jury were misled." (Emphasis in original; internal quotation marks omitted.) *State* v. *Greene*, 11 Conn. App. 575, 580–81, 528 A.2d 855, cert. denied, 205 Conn. 804, 531 A.2d 938 (1987).

## A

Initially, the defendant claims that the trial court's improper instructions to the jury regarding the credibility of witnesses deprived him of a fair trial. Specifically, the defendant claims that the trial court (1) refused to give an instruction on accomplice credibility and (2) failed to instruct the jury that if it found a witness to have testified falsely, it could reject all of the testimony provided by that witness.[17]

## 1

The defendant first claims that the trial court improperly refused to give an instruction on the special considerations applicable to accomplice testimony. We do not agree.

---

[17] The defendant claims that the trial court's failure to instruct the jury as requested deprived him of a fair trial in violation of the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. We note, however, that failure to give the accomplice instruction does not violate a constitutional right. See *State* v. *King*, 35 Conn. App. 781, 794, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995). In addition, claimed instructional errors involving general principles of credibility of witnesses are not constitutional in nature. See *State* v. *Dash*, 242 Conn. 143, 152, 698 A.2d 297 (1997). We, therefore, review this claim under the nonconstitutional standard of review for claimed instructional errors, namely, whether it is reasonably probable that the jury was misled.

In his request to charge, the defendant requested that the trial court instruct the jury that Dolphin participated in the crime charged against the defendant.[18] The trial court did not give this instruction to the jury. The trial court, however, gave the jury general instructions on what it could consider in determining Dolphin's credibility.[19] On appeal, the defendant claims that the trial court should have instructed the jury that it should view Dolphin's testimony with special caution because there was evidence that he was a culpable party.

"The trial court has the duty to instruct the jury to scrutinize carefully the testimony of an accomplice of the defendant when the evidence so warrants. . . . The court's duty to so charge is implicated only where the

[18] Specifically, the defendant's request to charge stated: "By his own testimony, and the reasonable inferences you may draw therefrom, you [may] conclude that . . . [Dolphin] participated in the crimes charged against the defendant. You may conclude that he was an accomplice and under the law an accomplice who testifies is in a different position from other witnesses.

"The law looks upon accomplice testimony with a suspicious eye. Such evidence must be scrutinized with the utmost caution because it lacks the inherent reliability attached to the testimony of a disinterested witness. Thus in weighing the testimony of an accomplice you must remember he is a criminal; and everything else being equal you would not believe the testimony of an admitted criminal as readily as you would that of a person of good character."

[19] The trial court charged the jury as follows: "Dolphin has two felony convictions. In weighing . . . credibility . . . you may consider his felony convictions and give such weight to this evidence as you determine to be reasonable in weighing the testimony and the credibility of that witness and for no other purpose." Thereafter, the trial court also instructed the jury that: "Identification of the defendant as having been at the scene on the date and time in question is claimed by the state as having been made by . . . Dolphin. . . . In assessing the reliability of this testimony, you should take into account the opportunity the witness had to observe the defendant, the degree of certainty of identification made in court, whether the witness knew the person before the identification, the circumstances and degree of certainty of any out-of-court identification made, the fact that a witness' explanation of any failure to previously identify the defendant and any other circumstance which you think is relevant to the issue of identification . . . ." The trial court also instructed the jury that prior inconsistent statements could be considered in determining credibility. See footnote 22.

trial court has before it sufficient evidence to make a determination that there is evidence that the witness was in fact an accomplice." (Citations omitted; internal quotation marks omitted.) *State* v. *Hooks*, 30 Conn. App. 232, 245, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993).

Our review of the evidence, viewed in the light most favorable to support the defendant's request to charge; *State* v. *Fuller*, 199 Conn. 273, 275, 506 A.2d 556 (1986); discloses that the trial court had nothing before it to support a factual finding that Dolphin acted as an accomplice. The jury was clearly aware through Dolphin's testimony, and through defense counsel's summation,[20] that Dolphin spoke to police only one month after the incident when he was arrested on separate charges, and that he waited until October, 1995, to identify the defendant. Dolphin admitted that the statement given to Ahern was false and stated the reasons behind his decision to make the false statement. Dolphin also testified that he was involved in drug activity with the defendant and the other individuals. The jury was also aware of the fact that Dolphin had two felony convictions. All of that evidence was before the jury. The trial court instructed the jury that a felony conviction is a factor that it could weigh in assessing his credibility.

[20] Defense counsel stated: "Not only did [Dolphin] come in and boldfacedly admit that [he] lied on a bunch of occasions, but he lied to you specifically when he told you that he was threatened on March 8, 1995, and he certainly tried to deceive you about the circumstances in which he was arrested in April [of] 1994 in just how much trouble he was in. . . . Dolphin realizes he is in an enormous amount of trouble when he gets arrested in April of 1994, so that's the reason why he decides to talk to the police, to try to get himself out of trouble. . . . Remember what happens in the interval between March 8, 1995, and when he talks to the investigators and the prosecutors and the police back in September and October of 1995, and eventually looks at the photo array, which he had looked at in March and made no identification and told the police I don't recognize anybody there and then comes back six months later and says, oh, yeah, I recognized somebody, that's the guy . . . ."

Furthermore, the trial court gave a charge on the credibility of witnesses and how the jury was to deliberate on that issue. Specifically, the trial court instructed the jury that, when making a determination as to the credibility of a witness, it should take into consideration the motives that influence human action and any interest in the outcome of the case, prejudice, bias or sympathy that the witness might have.

In the absence of sufficient evidence to support the theory that Dolphin participated in the preparation for, or the execution of the defendant's crimes, there was no need for the trial court to give the charge that the defendant sought. See *State* v. *Hooks*, supra, 30 Conn. App. 246.

## 2

The defendant next claims that the trial court failed to instruct the jury that it could reject the entire testimony of a witness if it concluded that the witness had intentionally testified falsely at trial. We are not persuaded.

The defendant claims that the trial court should have instructed the jury on the "falsus in uno, falsus in omnibus" maxim.[21] Specifically, the defendant requested that the trial court instruct the jury that if it concluded that a "witness not only testified falsely, but . . . did so intentionally . . . this fact casts a serious doubt on all of his testimony; and you might well conclude that you cannot accept any of it." The trial court did not charge as requested. The trial court, however, gave a general charge on credibility.[22] The defendant argues on appeal

[21] This maxim expresses the general principle of law that it is the prerogative of the jury to discredit the entire testimony of a witness if it determines the witness intentionally testified falsely in some respect. *State* v. *Smith*, 201 Conn. 659, 666, 519 A.2d 26 (1986).

[22] The trial court's charge on the credibility of witnesses included the following instruction: "The credibility of witnesses and the weight to be given their testimony are matters which [are] peculiarly your function to

that Dolphin's credibility was crucial to his defense, and that the charge issued by the trial court did not adequately convey to the jury its role in assessing a witness' testimony.

"The falsus in uno instruction requested by [the defendant] is permissive, not mandatory, and rests in the sound discretion of the trial court." *State* v. *Smith,* 201 Conn. 659, 666, 519 A.2d 26 (1986). The trial court instructed the jury that, "[t]he credibility of witnesses and the weight to be given their testimony are matters which [are] peculiarly your function to determine." Further, the jury was told that "[i]f any facts are admitted or otherwise proved to you, you may well bring them into relation with his or her testimony and see if they fit together with it. In short, you are to bring to bear upon it the same considerations and use the same sound judgment that you would apply to questions of truth or veracity which are daily presenting themselves for your decision in the ordinary affairs of life. Any conduct or

---

determine. . . . No fact is, of course, to be determined merely by the number of witnesses testifying for or against it. It is quality, not quantity of testimony which controls. In weighing the testimony of a witness, you should try to size him or her up. You should have in mind all those little circumstances which point to his or her truthfulness or untruthfulness. You should consider any possible bias or prejudice he or she may have, whether for or against the state or the defendant, his or her interest of whatever sort in the outcome of the trial, his or her ability to observe facts correctly and to remember and relate them truthfully and accurately. You should test the evidence each witness gives you by your own knowledge of human nature and of the motives which influence and control human action. If any facts are admitted or otherwise proved to you, you may well bring them into relation with his or her testimony and see if they fit together with it. In short, you are to bring to bear upon it the same considerations and use the same sound judgment that you would apply to questions of truth or veracity which are daily presenting themselves for your decision in the ordinary affairs of life. Any conduct or statement of a witness, which you find inconsistent with any other conduct or statement of that witness, you may consider in weighing the credibility of that witness. Also, conduct or statement of the witness which you find consistent with any other conduct or statement of that witness, you may also consider in weighing the credibility of that witness."

statement of a witness, which you find inconsistent with any other conduct or statement of that witness, you may consider in weighing the credibility of that witness."

"It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985). We are persuaded that the trial court's instruction, as given, made it clear to the jury that the credibility of the witnesses was for it to determine. The jury, after all, in using the common sense that it would apply in the ordinary affairs of life would consider untruthfulness, inconsistencies and motives in determining whether *any* testimony of a witness who has intentionally testified falsely should be found credible.

Viewing the charge on credibility in its entirety, as we must; *State* v. *Middlebrook,* supra, 51 Conn. App. 728; we conclude that the trial court adequately and accurately instructed the jury on the credibility of witnesses. See *State* v. *Smith,* supra, 201 Conn. 667.

B

The defendant finally claims that the trial court improperly failed to instruct the jury that it could make its own determination as to the authenticity of a letter that was admitted into evidence.[23] We are not persuaded.

The state introduced into evidence a handwritten letter obtained from Harris' attorney, Tom Farver. The letter was addressed to "Chic" and did not contain the author's signature. On the basis of the compilation of the individual characteristics discovered in the letter

---

[23] Specifically, the defendant requested that the trial court instruct the jury that as the trier of fact, it could "compare genuine specimens with the disputed document and determine authenticity, with or without expert testimony."

and the defendant's known writings, Streeter opined that the defendant was the author of the letter. In the letter, the defendant indicates that he could incriminate himself for no reason, because "Jeff" Dolphin might never appear in court to testify. The letter also states, "all yall want me to do is cop out, but if it comes down to it i will because i did it and i can hold my own and that's that i will do the time if i have to but not if we can beat it."

During its charge, the trial court instructed the jury that "four witnesses . . . have rendered to you their opinions in certain areas. These witnesses [included] James Streeter, the questioned document examiner. No matter what the expertness or qualifications of the particular witness who states to you what an opinion may be, it is still subject to be reviewed at your hands. It is in no way binding upon you. It is for you to consider it with the other circumstances in the case and using your best judgment determine whether or not you will give any weight to it, and, if so, what weight you will give to it." Thereafter, the trial court also instructed the jury that "you have every right to look at each and every piece of evidence . . . ."

The defendant specifically claims that, although the jury might have understood that it was free to reject Streeter's opinion, it could not have understood the instruction to mean that it could take an active role in making the decision to accept or to reject his testimony by examining the documents itself. When we review the instruction in light of the entire charge, we conclude that the defendant's claim once again is unavailing.

The trial court's instruction indicated to the jury that it was not bound by Streeter's opinion, that it could review the opinion and that it had the right to examine all the evidence. The jury is presumed to follow the instructions given by the trial court. *State* v. *Teti*, 50 Conn. App. 34, 45, 716 A.2d 931, cert. denied, 247 Conn.

921, 722 A.2d 812 (1998). Therefore, in the absence of evidence to the contrary; see id.; we must presume that the jury followed the trial court's instructions.[24] The cautionary language set forth in the instruction convinces us that there was no reasonable probability that the instruction misled the jury. The trial court was under no duty to instruct the jury precisely as the defendant requested. See *State* v. *Middlebrook*, supra, 51 Conn. App. 729. We conclude that the trial court's instruction fairly covered the requested instruction in its charge. See id.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[24] Furthermore, as noted above, "[i]t is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." *State* v. *Zayas*, supra, 195 Conn. 620. The jury had before it a photocopy of a chart produced by Streeter, and entered in evidence as a state's exhibit, that compared the individual characteristics of the letter to the characteristics of the defendant's known writings. The jury was, therefore, able to follow along as Streeter reviewed the characteristics of the writings. In addition, defense counsel, during closing argument, reminded the jury that Streeter had testified that different document examiners could arrive at different conclusions as to the author of the letter. Defense counsel, as well as the state, urged the jury to examine the documents. In reviewing this verdict, we cannot now assume that the jury put aside its common sense in determining that it should examine the documents itself.