# WILLIAM B.* *v.* COMMISSIONER OF CORRECTION
## (AC 31051)

Robinson, Alvord and Borden, Js.

in Light of *Crawford* v. *Washington* and *Giles* v. *California*," 85 N.Y.U. L. Rev. 1291 (2010).

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued March 15—officially released May 10, 2011

*Michael D. Day*, for the appellant (petitioner).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Jo Anne Sulik*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

ROBINSON, J. The petitioner, William B., appeals following the habeas court's granting of his petition for certification to appeal from the judgment denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly (1) concluded that he failed to prove that the state suppressed exculpatory evidence at his criminal trial in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and (2) denied his claim of ineffective assistance of trial counsel. We affirm the judgment of the habeas court.

In the underlying criminal matter, the petitioner was convicted after a jury trial of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and two counts of risk of injury to a child in violation of General Statutes § 53-21. Following a direct appeal, this court reversed the petitioner's conviction

of one count of sexual assault in the second degree on the ground of insufficient evidence but affirmed the conviction in all other respects. *State* v. *William B.*, 76 Conn. App. 730, 822 A.2d 265 (2003). Our Supreme Court denied certification to appeal from that decision. *State* v. *William B.*, 264 Conn. 918, 828 A.2d 618 (2003).

In the petitioner's direct appeal, this court set forth the following factual background: "The [petitioner] is the victim's father. From the time she was born in 1982 until 1993, the victim lived with the [petitioner], her mother and her half-sister [C] in the town of B. In 1993, when her parents separated, the victim resided with the [petitioner] in the town of S until she was removed from his care in late 1994 or early 1995. Prior to the separation, [C] saw the [petitioner] perform cunnilingus on the victim and witnessed the victim perform fellatio on the [petitioner]. Those acts occurred two or three times a week when the victim's mother was not at home. The victim was not a willing participant in that sexual activity, and the [petitioner] gave her money, candy or cigarettes so that she would not tell anyone.

"Subsequent to the [petitioner's] divorce from his wife, a male acquaintance of the [petitioner] visited him and the victim in their home in the town of S. He participated in a game invented by the [petitioner] called 'naked hide-and-seek.' The [petitioner's] game was played by turning out the lights and hiding. The person who was found had to remove an article of clothing. The game ended when everyone was naked. The [petitioner] encouraged his acquaintance to touch the victim sexually. According to the acquaintance, he subsequently was convicted of sexual assault in the first degree for acts he perpetrated on the victim when he was with the [petitioner] and the victim.

"During the time the victim was living with the [petitioner] in the town of S, the victim's school friends

visited their home every day. In 1994, one of the school friends [K] observed the [petitioner] make frequent sexual gestures and comments to the victim. She saw the [petitioner] gesture with his tongue as if performing oral sex and saw him touch the victim's buttocks. She was present when the [petitioner] dared the victim to remove her shirt in front of him, which the victim did. On one occasion, the [petitioner] pretended to go into the shower, but instead jumped naked in front of [K], the victim and another girl [J]. Sometime in late 1994, [K] told her mother, and then the police, what she had observed. The police conducted an investigation as a result of [K's] report. Shortly after [K] made her report, the victim was removed from the [petitioner's] care by agents of the department of children and families [(department)], who instituted neglect proceedings against the [petitioner].

"In May, 1998, agents of the department . . . referred the victim to the Children's Home of Cromwell (home), a residential treatment center for children who have encountered severe emotional abuse and are in need of therapy. The victim was placed in the home as a result of her self-injurious behavior, suicidal ideation, aggressiveness, obsession with death and dying, and attempted suicide. During the course of her treatment at the home, the victim revealed to her therapists that the [petitioner] had sexually abused her.

"In April, 1999, Michael Shanley, a police detective, interviewed the [petitioner] about the victim's allegations of sexual abuse. In response to questions as to whether he had had sexual relations with his daughter, the [petitioner] responded, 'I don't remember.' " *State* v. *William B.*, supra, 76 Conn. App. 733–35.

On July 3, 2007, the petitioner filed an amended petition for a writ of habeas corpus, alleging that the state had suppressed exculpatory evidence at his criminal

trial in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83. He also alleged that his trial counsel, Alfred Morocco, Jr., had provided ineffective assistance by (1) failing to request records of the department that related to an investigation into whether the petitioner had abused the victim (department records), (2) improperly cross-examining certain state witnesses, and (3) advising the petitioner not to testify at the criminal trial. The habeas court conducted an evidentiary hearing, and, thereafter, it issued a fifty-six page memorandum of decision denying the amended petition. The court granted the petitioner's petition for certification to appeal from the denial, and this appeal followed. Additional facts will be set forth as necessary.

I

The petitioner first claims that the habeas court improperly concluded that he failed to prove that the state suppressed exculpatory evidence at his criminal trial in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83. Specifically, the petitioner argues that the state violated the rule of *Brady* by failing to disclose the department records. We are not persuaded.

The following additional facts are relevant to the petitioner's first claim. At the petitioner's criminal trial, the state called the victim as a witness, but she was unable to complete her testimony. The court ordered that her testimony be stricken, and the jury was instructed to disregard it. *State* v. *William B.*, supra, 76 Conn. App. 733 n.2. The state also called as witnesses Tony Gibson and Asha Patlikh, licensed marriage and family therapists, who had treated the victim during her stay at the home. Id., 736. The court permitted Gibson and Patlikh to testify as to the disclosures of sexual abuse made by the victim.[1] Id., 736–38. Gibson

---

[1] The court admitted the testimony under the medical treatment and diagnosis exception to the hearsay rule; Conn. Code Evid. § 8-3 (5); and this court affirmed that ruling in the petitioner's direct appeal. *State* v. *William B.*, supra, 76 Conn. App. 736–44.

testified that the victim revealed that the petitioner had asked her to engage in sexual favors, including "oral sex, rubbing different body parts, being rubbed, having to lick [the petitioner] and vice versa." Id., 738 n.4. In addition, Gibson testified that the victim had revealed that the petitioner had asked her to play sexual " 'games'," including a game of hide-and-seek, which required her to get undressed and perform sexual favors. Id.

In his amended petition, the petitioner alleged that, during his criminal trial, the state had "failed to obtain, review and turn over exculpatory evidence as well as impeachment evidence," and that it was "reasonably probable that the outcome [of his criminal trial] would have been different" had the state disclosed this evidence. During the evidentiary hearing, the petitioner's habeas counsel presented a collection of documents that he represented to the habeas court as being the department records. Habeas counsel explained that he had received these records from the petitioner's appellate counsel, and, although he could not state for certain, he assumed that they had been provided to appellate counsel by the petitioner's trial counsel.[2] The court thereafter conducted an in camera review of the records to ascertain whether they contained any exculpatory evidence.

In its memorandum of decision, the court found that the department records[3] contained some exculpatory

[2] The record does not make clear whether the petitioner's trial counsel had these documents in his possession during the criminal trial. At the evidentiary hearing, the petitioner's trial counsel testified that he was aware that the department had conducted an investigation of the petitioner and that there had been a juvenile proceeding that involved the petitioner. The petitioner's trial counsel also testified that he had received a file from Konstantinos Diamantis, the attorney who represented the petitioner in the juvenile proceeding, and, although the file contained "some reports," he did not know "whether they originated from the [department] . . . ."

[3] In its memorandum of decision, the habeas court appears to assume that the documents were the department records without making a specific factual finding to that effect. Therefore, for purposes of resolving the petition-

information, including "reports by [department] employees that the victim . . . denied any sexual abuse by the petitioner" and reports that the victim indicated that she wanted to live with the petitioner following the divorce of her parents. Although the court suggested that these records may not have been suppressed, either because they were not in the possession of the state or because they were known to the petitioner, it ultimately concluded that the petitioner had failed to establish "the necessary materiality" of this evidence. On the basis of this conclusion, it denied the petitioner's *Brady* claim.

We begin by setting forth the legal principles that guide our disposition of the petitioner's claim. "In [*Brady* v. *Maryland*, supra, 373 U.S. 83] . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the [petitioner] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [petitioner], and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 492, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007). "Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

er's claims on appeal, we assume, without deciding, that the documents were created by the department and that the documents were related to the department's investigation into whether the petitioner had abused the victim.

The petitioner argues that the state suppressed the department records because it knew, or should have known, of their existence but nevertheless failed to disclose them. Furthermore, he argues that the department records were favorable evidence because the victim's statements contained therein: (1) could have been admitted into evidence under the business record exception; General Statutes § 52-180; Conn. Code Evid. § 8-4; and the party opponent exception to the hearsay rule; Conn. Code Evid. § 8-3 (1); and considered by the jury as evidence of his innocence; or (2) in the alternative, could have been used to impeach the credibility of the victim as a hearsay declarant; Conn. Code Evid. § 8-8. Finally, the petitioner argues that the department records were material evidence because they "clearly demonstrate[d] that [the victim] maintained, at a closer temporal proximity to the alleged assaults, that [the petitioner] did not engage in such assaults."

Under the facts of the present case, even if we were to assume, without deciding, that the department records were suppressed by the state, that they contained evidence favorable to the petitioner and that they would have been admissible in the criminal trial, we conclude that this evidence was not material under *Brady*. "In order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying *all* three prongs of the aforementioned test. . . . Even if a defendant is able to demonstrate that the government suppressed *favorable* evidence, he must still demonstrate that the evidence is *material*. The test for materiality is well established. Undisclosed exculpatory evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Garlington*, 122 Conn. App. 345, 358, 998 A.2d 1197, cert. denied, 298 Conn. 910, 4 A.3d 835 (2010).

"In analyzing a *Brady* claim, the courts must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.) *State* v. *Shannon*, 212 Conn. 387, 399–400, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989).

In the present case, the statements in the department records are not overly compelling when considered along with the evidence of sexual assault adduced by the state. In addition to the hearsay declarations of the victim, the state also presented the testimony of the victim's half-sister, C; a school friend of the victim, K; and an acquaintance of the petitioner. These witnesses testified to multiple and different acts of sexual assault perpetrated by the petitioner against the victim. Along with the witness' testimony, the state also introduced the petitioner's statement to Shanley that he could not remember whether he had sexual relations with the victim, his daughter.[4] Therefore, in light of the abundance of evidence of sexual assault, we simply cannot conclude that there is a reasonable probability that the outcome of the petitioner's criminal trial would have been different had the state disclosed the department records.

---

[4] As the habeas court noted, it could not "envisage a more incriminating response."

Furthermore, we reach the same conclusion even if we were to assume, without deciding, that the victim's statements could have been used to impeach the victim's hearsay declarations only. "Impeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) *State* v. *Richard W.*, 115 Conn. App. 124, 137, 971 A.2d 810, cert. denied, 293 Conn. 917, 979 A.2d 493 (2009). "It is well established that impeachment evidence may be crucial to a defense, especially when the state's case *hinges entirely upon the credibility of certain key witnesses.* . . . The rule laid out in *Brady* requiring disclosure of exculpatory evidence applies to materials that might well alter . . . the credibility of a *crucial prosecution witness.* . . . In determining whether impeachment evidence is material, the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [impeachment evidence]." (Citation omitted; emphasis added; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 158–59, 10 A.3d 578 (2011).

As we discussed previously, although the state offered the hearsay declarations of the victim in support of its claims against the petitioner, it also presented the petitioner's statements to Shanley and the testimony of three witnesses. Therefore, because this was not a case in which the state's case hinged entirely on the hearsay declarations of the victim, and because the department records could not have been used to impeach the testimony of the other witnesses, we cannot conclude that the verdict might have been different if the hearsay declarations of the victim were impeached by the victim's statements in the department

records. Accordingly, we conclude that the habeas court properly denied the petitioner's *Brady* claim.

## II

The petitioner next claims that the habeas court improperly denied his claim of ineffective assistance of trial counsel. Specifically, the petitioner argues that he was provided with ineffective assistance due to trial counsel's (1) failure to investigate and to introduce the victim's statements in the department records, (2) cross-examination of K, and (3) examination of Shanley. We disagree.

Before considering the petitioner's second claim, we set forth the standard of review and legal principles applicable to claims of ineffective assistance of counsel. "Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by [an appellate] court . . . .

"To determine whether the petitioner has demonstrated that counsel's performance was ineffective, we apply the two part test established in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . According to *Strickland*, [a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both

prongs are satisfied." (Citations omitted; internal quotation marks omitted.) *Sargent* v. *Commissioner of Correction*, 121 Conn. App. 725, 737–38, 997 A.2d 609, cert. denied, 298 Conn. 903, 3 A.3d 71 (2010). "Because the petitioner must satisfy both prongs of the *Strickland* test to prevail on a habeas corpus petition, this court may dispose of the petitioner's claim if he fails to meet either prong." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, supra, 117 Conn. App. 301; see *Dorce* v. *Commissioner of Correction*, 118 Conn. App. 750, 754, 984 A.2d 1173 ("[a] reviewing court need not address both components of the inquiry if the [petitioner] makes an insufficient showing on one" [internal quotation marks omitted]), cert. denied, 295 Conn. 919, 991 A.2d 564 (2010).

In reviewing the performance of trial counsel, we are mindful that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Diaz* v. *Commissioner of Correction*, 125 Conn. App. 57, 62–63, 6

A.3d 213 (2010), cert. denied, 299 Conn. 926, 11 A.3d 150 (2011).

A

We first consider the petitioner's argument that he was provided ineffective assistance due to trial counsel's failure to investigate and to introduce the victim's statements in the department records. Specifically, the petitioner contends that had counsel obtained this evidence and presented it to the jury, it would have affected the jury's determination of guilt. We are not persuaded.

In its memorandum of decision, the habeas court noted that it was unclear whether or not the petitioner's trial counsel had the department records in his possession at the time of the criminal trial. Notwithstanding this uncertainty, the court concluded that "it [was] ultimately irrelevant whether [trial] counsel's failure to properly investigate by securing the [department] records was ineffective in that they would have revealed exculpatory information or whether [trial] counsel was ineffective because in fact, he had some or all of the exculpatory portions of the [department] records and did not use the records . . . ." Under either scenario, the court concluded that the petitioner had failed to demonstrate any prejudice.

Even assuming, without deciding, that counsel's performance was deficient, there is not a reasonable probability that, but for counsel's deficient performance, the outcome of the petitioner's criminal trial would have been different. In part I of this opinion, we concluded that the department records were not material evidence under *Brady*. As this court previously has recognized, "[t]he standard for proving *Strickland*'s second prong of an ineffective assistance of counsel claim is equivalent to the standard of materiality encompassed in a

*Brady* claim . . . ." (Citation omitted; internal quotation marks omitted.) *Elsey* v. *Commissioner of Correction*, supra, 126 Conn. App. 163. Therefore, for the reasons set forth in part I of this opinion, we conclude that the failure of the petitioner's trial counsel either to discover the department records or to use them during the petitioner's criminal trial was not prejudicial to the petitioner.

B

We next consider the petitioner's argument that he was provided ineffective assistance due to trial counsel's cross-examination of K. More specifically, the petitioner contends that counsel's cross-examination of K was deficient because it elicited testimony that the petitioner had engaged in inappropriate sexual conduct with K. The petitioner contends that he was prejudiced by this deficiency because the jury learned that he had been sexually inappropriate with other children. We are not persuaded.

At the petitioner's criminal trial, the state called K as a witness. Before K testified, the petitioner's trial counsel filed, and the trial court granted, a motion in limine precluding any testimony from K that related to the petitioner's conduct with her, for which he had previously been convicted.[5] The state indicated that it intended to inquire into the petitioner's conduct with the victim only and that it had no intention of probing into the petitioner's conduct with K.

During direct examination, the prosecutor inquired as to whether K observed "any conduct that struck [her] as unusual between a daughter and a father." In response, K testified that among other conduct, she

---

[5] With regard to K, the record is unclear regarding the charge or charges for which the petitioner was convicted, the conduct that formed the basis of the charge or charges, and the sentence the petitioner received in connection therewith.

"noticed . . . nudity on behalf of [the petitioner]." During cross-examination, the petitioner's trial counsel further inquired into the nudity that K alleged to have witnessed. That inquiry resulted in the following colloquy:

"[Trial Counsel]: Now, you said there was nudity on the part of [the petitioner]?

"[The Witness]: Uh-hum.

"[Trial Counsel]: That was [at the petitioner's] home. Correct?

"[The Witness]: Uh-hum.

"[Trial Counsel]: And you were over there. How did you see this? Tell me what happened. You said there was nudity on his part. Can you tell me what happened?

"[The Witness]: He had gone into the bathroom and pretended to get ready to go in the shower and had jumped out on me, [the victim], and [J] naked.

"[Trial Counsel]: Okay. Let me ask you a question. You followed him into the shower?

"[The Witness]: Uh-um.

"[Trial Counsel]: You were looking into the shower?

"[The Witness]: No. He had called me to the shower to get him something.

"[Trial Counsel]: And you went there? You went to the shower?

"[The Witness]: Yeah."

The state then objected, arguing that this line of inquiry violated the motion in limine. After the court excused the jury, the petitioner's trial counsel explained that the state had "opened a door" to this line of inquiry by adducing testimony on direct examination that K

had observed nudity between the petitioner and the victim. According to the petitioner's trial counsel, he was attempting to ascertain where K had observed the nudity that she alleged to have witnessed. Thereafter, the court permitted the petitioner's trial counsel to inquire further.

In its memorandum of decision, the habeas court found that the state's direct examination of K conformed to the motion in limine. As a result, the court found that trial counsel's cross-examination of K "suggest[ed] [that] he was trying to bring out inconsistencies in her testimony." On the basis of these findings, the court concluded that the petitioner had failed to establish that his trial counsel's cross-examination of K constituted a deficient performance.

After carefully reviewing the record, we agree with the habeas court's conclusion that the cross-examination of K did not constitute a deficient performance. As the evidence demonstrates, trial counsel's cross-examination was aimed at undermining the testimony that K had provided during direct examination, which, as the habeas court found, and the petitioner does not contest, was elicited in response to questions by the prosecutor that conformed with the motion in limine. Therefore, although the petitioner may have been discontented with the responses provided by K, under the facts of the present case, we cannot conclude that the petitioner has overcome the presumption that, under the circumstances, trial counsel's cross-examination represented a sound trial strategy. See, e.g., *Diaz* v. *Commissioner of Correction*, supra, 125 Conn. App. 63; *Porter* v. *Commissioner of Correction*, 120 Conn. App. 437, 449, 991 A.2d 720, cert. denied, 298 Conn. 901, 3 A.3d 71 (2010).[6]

---

[6] In his brief on appeal, the petitioner also argues that his trial counsel's questioning of K constituted a "clear breakdown in the adversarial process," thereby triggering a presumption of prejudice, because the questioning violated the motion in limine. See *United States* v. *Williamson*, 53 F.3d 1500,

## C

We finally consider the petitioner's argument that he was provided ineffective assistance due to trial counsel's examination of Shanley. Specifically, the petitioner contends that counsel's examination of Shanley was deficient and prejudicial to him for two reasons: (1) it elicited testimony that the petitioner "had been arrested on a charge of violation of probation with respect to prior arrests for risk of injury to minors"; and (2) it permitted the state to question Shanley about the petitioner's inappropriate conduct with another individual. We are not persuaded.

At the time Shanley interviewed the petitioner, the petitioner was under arrest for violation of probation. During the petitioner's criminal trial, without referencing the arrest or violation of probation, the prosecutor asked Shanley whether the petitioner had signed a notice of rights form (rights form) during the interview. Shanley responded in the affirmative, and the state offered the rights form for identification.

The petitioner's trial counsel then asked to voir dire Shanley regarding the rights form but did not request that the jury be excused. In the presence of the jury, counsel asked: "Officer, could you tell me what this rights form was signed in regard to?" In response, Shanley stated: "On [the] previous evening, I had arrested [the petitioner] on the charge of violation of probation as a result of prior arrests for risk of injury to minors that he had violated." Thereafter, counsel asked that the answer be stricken and moved for a mistrial. The

1511 (10th Cir.), cert. denied sub nom. *Dryden* v. *United States*, 516 U.S. 882, 116 S. Ct. 218, 133 L. Ed. 2d 149 (1995). We disagree. K's testimony on cross-examination concerned what she observed while in the presence of the victim and the petitioner. Simply because she testified that she was also present—which of course was necessary in order for her to testify—did not violate the motion in limine.

court declined to strike the answer, and it did not act on counsel's request for a mistrial.

During cross-examination, Shanley disclosed that his interview with the petitioner had lasted no more than twenty-five to thirty minutes. Trial counsel then inquired: "[W]hat else did you talk about in that twenty-five minutes." Shanley responded: "We talked about a lot of different things. We talked about the weather, music, general conversation just to break the ice between the two of us." Counsel then inquired as to whether the petitioner admitted that he had engaged in any type of inappropriate conduct with the victim, to which Shanley responded in the negative.

On redirect examination, the state inquired as to what else the petitioner and Shanley had discussed during the interview. In response, Shanley testified: "When we initially sat down, I talked about a lot of different things in general. I know [the petitioner] is a big fan of music. We talked about that for a while. We talked about the weather, talked about where he was working . . . and then we got into the case that I was investigating. We also got into some of the things from previous cases involving [the petitioner]. And at some point, we did discuss some of his other daughters and allegations regarding them." The petitioner's trial counsel objected, arguing that this line of inquiry was beyond the scope of cross-examination. The court determined that trial counsel had opened the door to this inquiry by his question during cross-examination and permitted the state to continue, resulting in the following exchange:

"[The Prosecutor]: So, what else did you talk about, Detective?

"[The Witness]: Specifically, we talked about [C].

"[The Prosecutor]: And did you talk about any other matters?

"[The Witness]: Inappropriate actions that he had had with [C]."

In its memorandum of decision, with regard to the voir dire of Shanley, the habeas court first concluded that trial counsel's performance was deficient, reasoning that counsel should have asked that the jury be excused and should have inquired as to how the state intended to use the rights form. It then concluded, however, that the petitioner had failed to establish that he was prejudiced by this deficiency. With regard to the cross-examination of Shanley, the court determined that counsel's performance was not deficient, concluding that "counsel cannot be faulted for failure to limit the ambit of the opening the door rule when all he referred to was a certain time frame and what might have happened in that time frame."

After reviewing the records, the briefs and the arguments of the parties, we conclude that, even assuming, without deciding, that counsel's performance was deficient, the petitioner has failed to establish that a reasonable probability existed that, but for counsel's deficient performance, the outcome would have been different. The petitioner has not demonstrated how the result of his criminal trial would have been different if the jury had not been presented with testimony that he had been arrested for violation of probation or that he had inappropriate contact with C. The petitioner seems to argue that he was prejudiced by counsel's performance because the jury was allowed to consider this evidence in reaching a verdict, but "[t]he second part of the *Strickland* analysis requires more than a showing that the errors made by counsel *may have had some effect* on the outcome of the proceeding." (Emphasis added; internal quotation marks omitted.) *Ancona* v. *Commissioner of Correction*, 100 Conn. App. 283, 289, 918 A.2d 283, cert. denied, 282 Conn. 918, 925 A.2d 1099 (2007); see *Eastwood* v. *Commissioner of Correction*, 114

Conn. App. 471, 479, 969 A.2d 860 ("[m]ere conjecture and speculation are not enough to support a showing of prejudice" [internal quotation marks omitted]), cert. denied, 292 Conn. 918, 973 A.2d 1275 (2009). Accordingly, we conclude that the habeas court properly denied the petitioner's ineffective assistance of counsel claim.

The judgment is affirmed.

In this opinion the other judges concurred.