******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TERRANCE STEVENSON *v.* COMMISSIONER
# OF CORRECTION
## (AC 37559)

DiPentima, C. J., and Lavine and Keller, Js.

Argued January 12—officially released May 10, 2016

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Stephen A. Lebedevitch*, for the appellant (petitioner).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney,
with whom, on the brief, were *Michael Dearington*,
state's attorney, and *Adrienne Maciulewski*, assistant
state's attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, Terrance Stevenson, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court erred when it concluded that (1) the state did not commit a *Brady*[1] violation and (2) there was no reasonable likelihood that the false testimony of a state's witness affected the judgment of the jury. We affirm the judgment of the habeas court.

The facts underlying the petitioner's conviction were recounted in this court's decision disposing of his direct appeal: "On March 21, 1994, Jeffrey Dolphin became involved in a dispute with James Baker and the [petitioner] over a lost quantity of cocaine. At some point during this dispute, Baker, Dolphin and the [petitioner] were joined by Jermaine Harris, also known as 'Chico,' and Trent Butler. While Dolphin maintained that a third party lost the cocaine, the [petitioner] blamed Dolphin for the missing cocaine and pulled a gun on him.

"Thereafter, Baker asked, 'Why don't we make this motherfucker do it?' The [petitioner] pointed the gun at Dolphin again and forced him into the back of an old white station wagon driven by Baker. Butler, Harris, and the [petitioner] were also in the car. Butler then told Dolphin that they wanted him to shoot somebody to make up for the money that he had lost, which Dolphin refused to do.

"Upon Dolphin's refusal, Harris stated that he would shoot the victim, Amenophis Morris. At that point, Baker parked the vehicle on Exchange Street in New Haven, about one-half block from the victim's home. Harris got out of the car, put on a mask and walked to the victim's home accompanied by the [petitioner], while the others remained behind. Both of the men were armed. Dolphin then heard nine or ten gunshots from the direction of the victim's home, although he could not see who was shooting. When Harris and the [petitioner] returned to the vehicle, Harris shouted, 'I got him!' The victim had been shot to death as he sat on his front porch eating dinner.

"When the men let Dolphin out on another street, they threatened him and told him not to say anything about what had happened. Approximately one month after the homicide, the New Haven police department arrested Dolphin on unrelated narcotics charges. While in custody, Dolphin provided the police with information implicating Baker, Butler and Harris in the homicide. Dolphin did not give the police the [petitioner's] name or his street name, 'Joe the Flea.' The following day, Dolphin made a photographic identification of Harris.

"In February, 1995, in a tape-recorded statement, Dolphin informed Butler's attorney, Leo Ahern, that the

information he had told the police was false. Thereafter, in early March, 1995, in another conversation with the New Haven police, Dolphin made photographic identifications of Butler and Baker. At that time, Dolphin stated to the police that he did not recognize anyone else in the array of photographs, including the [petitioner]. In September, 1995, Dolphin informed the state's attorney's office that the statement that he made to Ahern was false. It was not until October 31, 1995, that Dolphin informed the police that the fourth individual involved in the homicide was 'Joe the Flea,' and that his real name was Terrance Stevenson, the [petitioner]." *State v. Stevenson*, 53 Conn. App. 551, 553–55, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999).

The habeas court found the following additional facts and provided the procedural history underlying this appeal. "Dolphin was the key state's witness against the petitioner, placing him at the scene of the crime and confirming his participation in the shooting and its planning. Thus, Dolphin's credibility was a key issue at the criminal trial.

"At the criminal trial, on direct examination, the jury was informed about Dolphin's inconsistent statements to police and . . . [to] Ahern regarding his identification of the petitioner, including that he lied to police and to Ahern. The petitioner's trial counsel also highlighted on cross-examination other important inconsistent statements made by Dolphin.

"Dolphin testified at the criminal trial that the reason he did not initially identify the petitioner was because he had been threatened by the petitioner's codefendants and others on a number of different occasions before and while he was incarcerated. In particular, Dolphin testified that immediately after the shooting, he did not report events to the police because he had been threatened by the petitioner and the codefendants, and as a result he was concerned for his mother and sister. He also testified that while he was incarcerated at the [New Haven Correctional Center], on several different occasions, he was threatened by the petitioner's codefendants and others not to testify against them.

"Dolphin testified as to one of these events in particular that he believed occurred on March 8, 1995, when he was transferred to the New Haven courthouse. On that date, he was threatened twice, once by Butler at the [New Haven Correctional Center] bull pen prior to being transferred to court and then later in the courthouse lockup by other inmates who roughed him up. When he returned to [the New Haven Correctional Center], Butler approached the petitioner and asked him 'if he got the message.'

"The petitioner claims that [Department of Correction (department)] documents, not disclosed to him by the state, show that Dolphin and Butler were not

transferred together to the New Haven courthouse on March 8. The petitioner claims that the state had a duty to produce these documents to him at the time of the trial to impeach Dolphin as to his claim that he was threatened on March 8. The petitioner also claims that the state failed to correct Dolphin's testimony as to which date he was threatened.

"At the habeas trial, the petitioner introduced internal administrative [department] information profile screens, known as 'RT-42s.' The purpose of this document is to identify inmates who should be separated from each other. A prosecutor may request that [the department] keep inmates separated at [department] facilities. The RT-42s are not contained in an inmate's master file, and not everyone at [the department] has clearance to review such documents. A person would have to know of the existence of such documents and expressly request them in order to obtain a copy.

"The petitioner introduced an RT-42 for Dolphin, indicating that he should be kept separated from Butler and Baker because Dolphin was expected to testify against them. . . . [Michael] Pepper, [an assistant state's attorney] who prosecuted the petitioner's criminal case, did not request that [the department] keep Dolphin separate from Baker and Butler, and was not aware of the existence of the RT-42 in this case. . . . Pepper did not have this document or any other [department] administrative documents in his file.

"Other [department] documents, including the continuance mittimuses, showed that while Dolphin had a court date on March 8, Butler did not. . . . Pepper was aware of this fact and at the criminal trial presented the testimony of a [department] employee, James Barone, during his rebuttal case to clarify that Butler and Dolphin were not transported together on March 8. However, Barone confirmed that the two were housed together at [the New Haven Correctional Center] around the time of the threats.

"Other [department] internal administrative documents, known as RT-60s, which show inmate movements, established that on February 22, 1995, Dolphin and Butler were together at the [New Haven Correctional Center]. A [department] transfer list from February 23, 1995, shows that Butler and Dolphin were transferred from [the New Haven Correctional Center] on that day."

"The petitioner was convicted after a jury trial of murder as an accessory in violation of General Statutes §§ 53a-54a (a) and 53a-8 and conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48 (a). He was sentenced to sixty years in prison.

"The petitioner appealed his convictions . . . [and the Appellate Court] rejected [his] claims and affirmed the convictions. [*State* v. *Stevenson*, supra, 53 Conn.

App. 553]. [Our] Supreme Court denied [his] petition for certification. *State* v. *Stevenson*, 250 Conn. 917, 734 A.2d 990 (1999).

"The petitioner has brought two prior petitions for habeas relief, asserting claims that his trial counsel, habeas counsel and appellate counsel were all ineffective. . . . Both prior petitions were denied, and the decisions were affirmed on appeal. See *Stevenson* v. *Commissioner of Correction*, 112 Conn. App. 675, 963 A.2d 1077, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009); *Stevenson* v. *Commissioner of Correction*, 67 Conn. App. 908, 792 A.2d 909, cert. denied, 260 Conn. 905, 795 A.2d 547 (2002).

"In this, the petitioner's third habeas petition, he claim[ed] that his constitutional right to due process was violated (1) as a result of the state's failure to disclose [department] documents that were material and exculpatory; and (2) by the prosecutor's failure to correct [Dolphin's] purported false testimony . . . ." The court found that the petitioner had not proven either of his claims because the department was not an investigative arm of the state and there was no reasonable likelihood that Dolphin's false testimony could have affected the judgment of the jury. The petition for certification was granted by the court. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the petitioner presents two issues. First, he claims that the court erred when it concluded not only that the state had not suppressed department administrative records in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), but also that the department administrative records were not material evidence. Second, the petitioner contends that the court incorrectly found, in contravention of *Giglio* v. *United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), and *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), that Dolphin's false testimony did not affect the judgment of the jury. We are not persuaded.

At the outset, we set the standards by which we review the petitioner's claims. "Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . The conclusions reached by the [habeas] court in its decision to [deny] the habeas petition are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 491, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007). Also, "[t]he habeas court is afforded broad discretion in making its factual findings, and those findings will

not be disturbed unless they are clearly erroneous." (Internal quotation marks omitted.) *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 448, 936 A.2d 611 (2007).

## I

The petitioner first claims that the court erroneously concluded that the state had not committed a *Brady* violation by suppressing department administrative records. Specifically, he argues that the RT-42 and the transport list, if turned over to his defense counsel, could have been used to impeach further Dolphin's testimony at his criminal trial. The petitioner reasons that because Barone was asked by the state to review departmental files and testify at the petitioner's criminal trial for the purpose of "correct[ing] the testimony given by . . . Dolphin," the department morphed into an investigative arm of the prosecution. Therefore, the petitioner contends, because the department "should have been deemed part of the prosecution team," the state had a duty to disclose the department's administrative records. Failure to do so, he asserts, constituted a *Brady* violation. We disagree.

The record reveals the following additional facts pertinent to this claim. On February 15, 2007, in a hearing on a motion to reopen the testimony of a witness in connection with the petitioner's second habeas petition, a records specialist for the department testified that the RT-42 entry was created because an attorney from the public defender's office had told the department that Dolphin would be testifying against Baker and Butler. She further testified that the RT-42 was confidential, not part of an inmate's master file, and inmates were not allowed to review it.

Our analysis of the petitioner's claim that the state suppressed exculpatory evidence is governed by *Brady* v. *Maryland*, supra, 373 U.S. 83. To establish a *Brady* violation, the petitioner bears the heavy burden of proving that "(1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [petitioner], and (3) it was material [either to guilt or to punishment]." (Internal quotation marks omitted.) *William B.* v. *Commissioner of Correction*, 128 Conn. App. 478, 484, 17 A.3d 522, cert. denied, 302 Conn. 912, 27 A.3d 371 (2011). If the petitioner fails "to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). Moreover, "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 140 Conn. App. 597, 606, 59 A.3d 403, cert. denied, 308 Conn. 920, 62 A.3d 1133 (2013).

We also are guided by the following legal principles. "The prosecution's duty to disclose applies to all material and exculpatory evidence that is within its possession or available to it . . . and that the prosecution knew or should have known was exculpatory. . . . [S]ee . . . General Statutes § 54-86c (a).[2] It is irrelevant whether the [s]tate [i.e., the prosecutor,] acted in good faith or bad faith in failing to disclose the evidence; negligent suppression may be sufficient. . . . Where evidence highly probative of [a defendant's] innocence is in [the prosecutor's] file, he should be presumed to recognize its significance even if he has actually overlooked it . . . and he is put on notice to disclose the evidence even in the absence of a request to do so." (Citations omitted; emphasis omitted; footnote added; internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 150–51, 547 A.2d 28 (1988). Importantly, "[t]he [s]tate's duty of disclosure is imposed not only upon its prosecutor, but also on the [s]tate as a whole, *including its investigative agencies.*" (Emphasis added; internal quotation marks omitted.) Id., 153. "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis." (Internal quotation marks omitted.) *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

To resolve the petitioner's claim, we must determine whether the habeas court correctly determined that the department was not an investigative arm of the state for the purposes of a *Brady* violation. The parties did not cite, nor did we find, any apposite Connecticut appellate precedent. Thus, we turn to the United States Court of Appeals for the Second Circuit to assist us in resolving this matter. See, e.g., *State* v. *Faria*, 254 Conn. 613, 625 n.12, 758 A.2d 348 (2000) ("we recognize that the decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of [the federal constitution]" [internal quotation marks omitted]).

In *United States* v. *Stewart*, 433 F.3d 273, 298 (2d Cir. 2006), the court explained: "Drawing on Supreme Court authority holding that *Brady* obligations extend to all persons 'acting on the government's behalf,' [the] [d]efendants urge that the scope of the 'prosecution team' should be similarly construed to impute government agents' false testimony to the prosecutors themselves. *Kyles* v. *Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); see also *Wedra* v. *Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982) (noting that

'the knowledge of a police officer may be attributable to the prosecutor if the officer acted as an arm of the prosecution'). According to [the] [d]efendants, because [a civilian employee of the United States Secret Service and its Laboratory Director and Chief Forensic Scientist] was a 'government official' working in conjunction with the prosecution, it is fair to attribute his knowledge of the perjured testimony, or that of other [Secret Service Forensic Services Division] employees, to the Government. But our determination of whether to deem an individual to be an 'arm of the prosecution' for *Brady* purposes does not follow the broad, categorical approach urged by [the] [d]efendants. Instead, the propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.' *United States* v. *Morell*, 524 F.2d 550, 555 (2d Cir. 1975). It does not turn on the *status* of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person *did*, not who the person *is*. See id. (imputing law enforcement agent's knowledge of confidential file to prosecutors where agent supervised the witness, participated actively in the investigation and frequently sat at counsel table throughout the trial); see also *United States* v. *Sanchez*, 813 F. Supp. 241, 247–48 (S.D.N.Y. 1993) (imputing to prosecutor knowledge of perjury of local police officers who were deputized as federal agents and worked as part of investigative task force), aff'd on other grounds, 35 F.3d 673 (2d Cir. 1994); *Pina* v. *Henderson*, 752 F.2d 47, 49 (2d Cir. 1985) (refusing to apply the 'descriptive term' of 'arm of the prosecutor' to parole officer who did not work 'in conjunction' with the police or the prosecutor)." (Emphasis in original.)

The petitioner contends that the department became part of the prosecution team because Barone was asked by the state to review department files and to testify that Dolphin and Butler were not transported to the New Haven courthouse on March 8, 1995. A significant point absent from the petitioner's recitation of the facts and his argument is that an attorney from the public defender's office requested that Dolphin be kept separated from Baker and Butler because he was testifying against them. In response to that request, the department created the RT-42; thus, it was not done in conjunction with the state's investigation of the petitioner's pending criminal case. Moreover, here, the court found that Pepper credibly testified that the state did not request that the department keep Dolphin separated from Baker and Butler, was unaware of the existence of the RT-42, and never had the RT-42 in its file. These findings support the conclusion that the RT-42 was created for purely administrative purposes. Thus, the department did not conduct an investigation to assist the state.

We conclude that the court correctly determined that the department was not an investigative arm of the state. In light of "the relevant inquiry [of] what the [department] *did*, not who the [department] *is*"; (emphasis in original) *United States* v. *Stewart*, supra, 433 F.3d 298; the record does not show that the department assisted in the investigation of the petitioner's criminal case. Because the court in determining that the documents at issue were "produced for internal [department] security and transfer purposes and not for purposes of assisting the state in prosecuting the petitioner" was not clearly erroneous, we will not disturb its findings. The petitioner has failed to demonstrate that the department was an investigative arm of the state; accordingly, the petitioner's claim fails under the first prong of *Brady*.[3]

## II

The petitioner also claims that the court erroneously found that there was no reasonable likelihood that Dolphin's false testimony could have affected the judgment of the jury. We disagree.

At the petitioner's criminal trial, his defense counsel filed a motion to suppress an identification made by Dolphin. At the suppression hearing, Dolphin testified that on March 8, 1995, Butler threatened him at the New Haven Correctional Center, which was the same day that he did not identify the petitioner in a photo array shown to him by a police detective. The motion was denied, and immediately afterwards, in the presence of the jury, Dolphin testified as a state's witness.

During direct examination, Dolphin was asked why he had failed to identify the petitioner in the photo array. Dolphin replied that he was being threatened and he initially wondered whether the last threat had occurred on March 28. The state showed Dolphin a document to refresh his recollection, and Dolphin identified the date as March 6, the day Butler threatened him at the New Haven Correctional Center. Nonetheless, three questions later, when asked to clarify the date on which he spoke to the police detective about the photo array, which would have been the day Dolphin claimed to have been threatened by Butler at the New Haven Correctional Center while awaiting transportation to the courthouse, Dolphin stated, "March 8."[4]

The state realized that Dolphin's testimony concerning the date was incorrect. Therefore, it called Barone to establish that Dolphin and Butler were not in the "bull pen" in the New Haven Correctional Center on March 8, effectively impeaching its own witness. At closing argument, defense counsel highlighted Dolphin's impeached testimony as follows: "The threat as [Dolphin] described it could not have happened in the manner he described it. . . . [Dolphin] lied to you . . . right here in the courthouse." In response, the state

asked the jury to consider Dolphin's ordeals at the time prior to March 8, i.e., incarcerated for several months with men who were threatening him. The state, then, explained to the jury, "[The state] would submit . . . that . . . Dolphin was mistaken, that he made a mistake, he had been in jail with these guys for months and months and months, that he got a date wrong, and the state brought that out." Finally, as found by the habeas court, department administrative documents established that Butler and Dolphin were transported from the New Haven Correctional Center to the court house on February 23, a fact that was not before the jury.

On appeal, the petitioner contends that his "conviction is fundamentally unfair because of the false and misleading testimony presented at both his suppression hearing and criminal trial." We note that this claim presents a claim of a constitutional nature, namely, that the state's failure to correct Dolphin's false testimony deprived the petitioner of a fair trial. We are not persuaded.

Our analysis is guided by the following longstanding legal principles. "The constitutional principle applicable to this case is that a conviction based on the use of false evidence known to be such by representatives of the state cannot stand. . . . This principle applies when the state, although not soliciting false evidence, allows it to stand uncorrected when it appears; *Napue* v. *Illinois*, [supra, 360 U.S. 269]; and even though such evidence merely goes to the credibility of the witness. Id. The good faith of the prosecution in these circumstances is immaterial. *Giglio* v. *United States*, [supra, 405 U.S. 153]. A new trial is required if the false testimony could in any reasonable likelihood have influenced the jury." (Citation omitted.) *Merrill* v. *Warden*, 177 Conn. 427, 431, 418 A.2d 74 (1979); see also *State* v. *Jordan*, 314 Conn. 354, 397, 102 A.3d 1 (2014) (*Espinosa, J.*, concurring) ("[a] subset of the *Brady* rule was established in *Napue*, which places an obligation on the prosecutor to correct false or misleading witness testimony").

"When, however, a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice

sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . *unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. . . .*

"In accordance with these principles, our determination of whether [the witnesses'] false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which [the petitioner was] otherwise able to impeach [the witness]." (Emphasis in original; internal quotation marks omitted.) *State* v. *Jordan*, supra, 314 Conn. 370–71.

Applying the principles to the facts of this case, we conclude that Dolphin's false testimony did not deprive the petitioner of a fair trial. First, in the petitioner's direct appeal, this court considered the strength of the state's case against him. See *State* v. *Stevenson*, supra, 53 Conn. App. 568 ("the state had a strong case against the [petitioner]: Dolphin's testimony, even though he was impeached by his prior inconsistent statement, detailed the events that transpired that evening, and his testimony was corroborated by Sharon Reed, Baker's girlfriend at the time of the homicide, the handwritten letter [penned by the petitioner and showing consciousness of guilt], and scientific evidence regarding the trajectory of the bullets"). Second, the state impeached Dolphin's testimony by establishing, through Barone, that Dolphin and Butler were not in the "bull pen" at the New Haven Correctional Center on March 8, the day that Butler allegedly threatened Dolphin. This provided defense counsel with favorable material for closing argument. In its rebuttal closing argument, the state responded by explicitly acknowledging that Dolphin's testimony concerning the date was a mistake. The state presented a possible explanation as to Dolphin's error. It was well within the province of the jury to accept or reject this explanation. See, e.g., *State* v. *Moye*, 112 Conn. App. 605, 610, 963 A.2d 690 ("it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 291 Conn. 906, 967 A.2d 1221 (2009). Moreover, in arguing his first claim on appeal, the petitioner makes the following observation: "Barone was asked to review files for the state's attorney's office and testify as to the [department's] transport of both Butler and Dolphin, *to correct the testimony given by . . . Dolphin.*" (Emphasis added.)

After a review of the record, we conclude that the court correctly found that there was no reasonable likelihood that the potentially misleading testimony of Dolphin could have affected the judgment of the jury. Accordingly, the petitioner's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

[2] General Statutes § 54-86c (a) provides: "Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant."

[3] Because the petitioner has not met his burden of satisfying the first prong of *Brady*, we need not reach the second prong. See *William B.* v. *Commissioner of Correction*, supra, 128 Conn. App. 485 ("[i]n order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying *all* three prongs of the aforementioned test" [emphasis in original; internal quotation marks omitted]).

[4] From the petitioner's criminal trial, the relevant examination occurred:

"[The Prosecutor]: Had you recognized anybody on that photo array?

"[Dolphin]: Yes, I did.

"[The Prosecutor]: Who did you recognize?

"[Dolphin]: The [petitioner], Terrance Stevenson.

"[The Prosecutor]: But you didn't tell the truth to [the police detective], is that correct?

"[Dolphin]: Yes, that's correct.

"[The Prosecutor]: And why didn't you tell [the police detective] the truth about that?

"[Dolphin]: Because I was being threatened.

"[The Prosecutor]: Tell us about that.

"[Dolphin]: I was locked up in [the New Haven Correctional Center] and at the same time I was locked up with three of the individuals, [Baker, Butler, and Harris].

"[The Prosecutor]: Okay. What happened?

"[Dolphin]: I seen [Baker, Butler, and Harris] on different occasions and each different time I was being threatened by them, and the last time came when the day I was brought down was March, was it the 28th?

"[The Prosecutor]: Let me show you this and see if this refreshes your recollection. . . .

"[Dolphin]: (Indicating yes.) March 6, I was going to court to be sentenced and at the time I was in the bull pen getting ready to go to court and at the same time . . . Butler was in the same bull pen and he grabbed me and pushed me and then two other individuals came along and words were being said like, you know, forget about this, you know, they tell you—they ask you anymore questions, don't tell them the truth because of that.

"[The Prosecutor]: You had months before given him . . . Baker's name and . . . Butler's name, is that correct?

"[Dolphin]: Yes.

"[The Prosecutor]: But you had not given the name other than Joe the Flea, is that correct?

"[Dolphin]: Yes.

"[The Prosecutor]: And just to clarify what date that was that you talked to [the police detective], I know those are hard to read. Let me see if this would refresh your recollection as to what date that was.

"[Dolphin]: March 8.

"[The Prosecutor]: Can you say that loud enough?

"[Dolphin]: March 8, [19]95."