******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

BENNIE GRAY, JR. *v.* COMMISSIONER
OF CORRECTION
(AC 47784)

Clark, Wilson and Sheldon, Js.

*Syllabus*

The petitioner, who previously had been convicted of possession of narcotics with intent to sell, appealed following the granting of his petition for certification to appeal from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed that the court improperly concluded that certain undisclosed impeachment evidence was not material either to guilt or to punishment under the third prong of *Brady* v. *Maryland* (373 U.S. 83). *Held*:

The habeas court properly rejected the petitioner's claim for relief from his conviction pursuant to *Brady* based on the state's failure to disclose to him certain impeachment evidence concerning D, one of the state's key witnesses at his criminal trial, as the undisclosed evidence would not have provided the petitioner with any significant impeachment material that was not already available to and used by him to cross-examine D at his criminal trial and, even though the undisclosed evidence could have cast doubt on D's general credibility, it was not of such significance, in the context of all the evidence adduced at trial, that it might reasonably have undermined confidence in the jury's guilty verdict.

Argued September 2—officially released November 4, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Wagner, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Rebecca R. Zeuschner*, deputy assistant state's attorney, with whom, on the brief, were *Matthew Gedansky*, state's attorney, and *Angela Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. Following a grant of certification to appeal, the petitioner, Bennie Gray, Jr., appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claims that the court improperly concluded that he is not entitled to relief from his 2019 conviction for possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a), based on the state's failure to disclose to him certain impeachment evidence concerning one of the state's key witnesses at his criminal trial, because it incorrectly determined that such undisclosed evidence was not "material either to guilt or to punishment," as required to prove a due process violation under the test set forth in *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We disagree and, accordingly, affirm the judgment of the habeas court.

The petitioner's challenged conviction was the subject of a direct appeal. See *State* v. *Gray*, 212 Conn. App. 193, 274 A.3d 870, cert. denied, 343 Conn. 929, 281 A.3d 1188 (2022). In affirming that conviction, this court recited the following relevant facts based upon the record of his criminal trial: "During the late afternoon hours of May 9, 2018, four plainclothes officers from the vice and narcotics unit of the New London Police Department (police department) were conducting surveillance near the intersection of Broad Street and Ledyard Street in New London. The officers were monitoring two convenience stores, the Gulf station located at 265 Broad Street and the 7-Eleven situated at the corner of Broad Street and Parker Street, which were locations known for narcotics trafficking. The officers were divided into teams of two, with investigators Todd Lynch and Jeremy Zelinski occupying one unmarked vehicle, and investigators Ryan Griffin and Joseph Pelchat occupying another.

"At approximately 4:30 p.m., the officers noticed a man, later identified as Brian Drobnak, standing alongside a Volvo sedan parked on the right side of the Gulf station parking lot. The officers observed Drobnak pace back and forth alongside the vehicle and continuously check his cell phone. They did not see Drobnak purchase gasoline, enter the convenience store, or use the air pressure machine near where the Volvo was parked.

"Shortly thereafter, a dark blue Toyota Camry, operated by a man later identified as the [petitioner], drove into the Gulf station and stopped alongside the Volvo. The officers observed Drobnak enter the front passenger seat of the Toyota, remain inside the vehicle for less than one minute, exit the vehicle, and subsequently enter the Volvo through the driver's side door. The officers could not see what transpired between Drobnak and the [petitioner] inside of the Toyota, but the brief nature of the interaction led them to believe that they had just witnessed a narcotics transaction. Accordingly, the officers decided that Lynch and Zelinski would investigate Drobnak, while Griffin and Pelchat would follow the Toyota. Lynch and Zelinski then drove into the Gulf station parking lot at the same moment that the Toyota was exiting the lot, parked their unmarked vehicle behind the Volvo, and exited the vehicle. Lynch walked toward the driver's side door of the Volvo while Zelinski approached the passenger's side.

"Through the driver's side window, Lynch observed Drobnak sitting in the driver's seat with a white, [rocklike] substance in his lap. Lynch later testified that Drobnak appeared to be manipulating the [rocklike] substance with the ink cartridge of a ballpoint pen. Lynch identified himself as law enforcement, at which point Drobnak attempted to conceal the ink cartridge and [rocklike] substance in the empty space between the driver's seat and the passenger's seat. Zelinski then opened the passenger side door, placed Drobnak in

custody, and took possession of the [rocklike] substance, which had fallen to the floor of the vehicle. Lynch performed a field test on the [rocklike] substance, which returned positive for crack cocaine. Drobnak was arrested and given *Miranda*[1] warnings. At the scene, Drobnak voluntarily agreed to speak with Lynch and Zelinski. He informed the officers that he had purchased $50 worth of crack cocaine from the man in the Toyota and showed them the phone number he had contacted to arrange the transaction.

"Meanwhile, Griffin and Pelchat continuously had been monitoring the Toyota operated by the [petitioner] since it had exited the Gulf station. After leaving the parking lot, the [petitioner] traveled down Broad Street and turned into a Sunoco station, where he remained for a few minutes. Griffin and Pelchat observed a woman, later identified as Amanda Barton, emerge from a restaurant next to the Sunoco station and walk toward the Toyota carrying two plastic bags. Once Barton entered the Toyota, the [petitioner] exited the Sunoco parking lot and turned onto Connecticut Avenue.

"As Griffin and Pelchat continued to follow the Toyota, they were informed by the other officers that Drobnak was found in possession of narcotics, was placed under arrest, and had told the officers that he had purchased the narcotics from the operator of the Toyota. . . . Griffin and Pelchat requested that the police department send a marked police cruiser to assist them in apprehending the Toyota. Sergeant Gregory Moreau, the street sergeant assigned to the patrol shift, responded to the officers' request. Shortly thereafter, Moreau pulled behind Griffin and Pelchat, who were still following the [petitioner] down Briggs Street. Moreau then maneuvered his police cruiser between

---

[1] "*Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)." *State* v. *Gray*, supra, 212 Conn. App. 198 n.3.

the Toyota and the officers' unmarked vehicle, activated his siren and overhead lights, and attempted to initiate a motor vehicle stop. Despite the siren and headlights, the [petitioner] continued to drive forward at a slow speed. Moreau then used his vehicle's public address system to order the [petitioner] to pull the Toyota over to the side of the road. After proceeding an additional two to four hundred feet, the [petitioner] came to a stop. Moreau exited the police cruiser and walked toward the driver's side window of the Toyota, while Griffin, who had exited the unmarked vehicle, began to approach the Toyota on foot.

"As Griffin drew closer to the Toyota, he observed Barton and the [petitioner] appear to manipulate their hands near their waists. Concerned that Barton and the [petitioner] could be concealing 'weapons' or 'narcotics' on their persons, Griffin and Moreau ordered the passengers to raise their hands to where the officers could see them. Barton complied immediately, but the [petitioner] raised his hands only after Griffin issued a second verbal command. The officers removed Barton and the [petitioner] from the Toyota and placed them in investigative detention. Griffin conducted a pat-down search of the [petitioner] for weapons and, after feeling 'a bulge in [the petitioner's] pocket,' uncovered $1268 in cash. Believing the cash to be the proceeds of narcotics transactions, the officers seized the currency. The officers also noticed three cell phones, including an LG cell phone, in the Toyota's center console. Although Barton and the [petitioner] each claimed ownership of one of the phones, neither claimed to own the LG phone.

"Around that time, Pelchat, who had parked the unmarked vehicle a short distance away, approached the [petitioner's] Toyota. Pelchat had been in contact with Lynch, who communicated that Drobnak had provided the officers with the phone number he had used to arrange the narcotics transaction. The officers agreed

that Lynch would use his city-issued cell phone to call the number once Pelchat arrived at the motor vehicle stop. When Lynch placed the call, Pelchat observed the unclaimed phone ring in the Toyota's center console and display Lynch's phone number as the incoming caller. The officers seized the phone. The [petitioner] was then placed under arrest and transported to the police department. No narcotics, residue, or paraphernalia were recovered from the scene.

"At the station, Lynch asked the [petitioner] why he was involved in selling narcotics, to which the [petitioner] responded, 'that's all I know.' . . . Drobnak was transported to the New London police station, where he provided a written statement indicating that he had purchased $50 worth of 'loose crack cocaine' from 'G,' and had done so on 'at least three different occasions.' Drobnak was also shown a photographic lineup consisting of eight photographs and was asked to determine whether one of those photographs displayed the individual from whom he had purchased narcotics. He identified an individual other than the [petitioner]. Later, at trial, Drobnak identified the [petitioner] as the individual from whom he had purchased narcotics and testified that he had purchased the narcotics using two $20 bills and one $10 bill. Drobnak explained that he initially misidentified the [petitioner] because his 'anxiety was off the wall,' he was going through withdrawal, and he 'just wanted [the police interview] to be over and to be done with.' He then testified that '[t]here is no doubt in my mind that [the petitioner] is the man who sold me crack cocaine.' Drobnak also testified that he was previously familiar with the [petitioner] and had purchased narcotics from the [petitioner] at least twice before. During cross-examination, Drobnak admitted that 'G' was actually the nickname of Greg Williams, a mutual acquaintance of Drobnak and the [petitioner].

Although Drobnak identified 'G' in his written statement, he testified that he had intended to refer to the [petitioner].

"A jury trial commenced on April 2, 2019. At trial, the [petitioner], appearing as a self-represented party, testified in his defense that he had previously met Drobnak a few days prior to May 9, 2018, when Drobnak had given the [petitioner] and Williams a ride to Groton. The [petitioner] stated that he had left his son's cell phone—the same unclaimed LG phone recovered from the [petitioner's] center console—in Drobnak's car. He further testified that he had met with Williams on the morning of May 9, 2018, and that Williams had returned the phone to him. The [petitioner] asserted that Drobnak contacted him later that day in order to speak with him about the missing phone. The [petitioner] agreed, and the two arranged to meet at the Gulf station.

"The [petitioner] testified that Drobnak briefly entered the [petitioner's] car in the Gulf station parking lot and requested a financial reward for finding the missing cell phone. The [petitioner] told Drobnak that the phone already had been returned to him and asked Drobnak to exit his car. The [petitioner] denied selling narcotics and testified that the seized currency was income he had earned working as a groundskeeper at Lake of Isles golf course in North Stonington. He asserted that he planned to use the money to pay for rent." (Footnote in original; footnotes omitted.) Id., 196–202.

After a jury found the petitioner guilty as charged of possession of narcotics with intent to sell in violation of § 21a-277 (a), he was sentenced to twenty years of incarceration, execution suspended after twelve years, followed by five years of probation. The Sentence Review Division of the Superior Court subsequently reduced the petitioner's sentence to twelve years of

incarceration, execution suspended after seven years, followed by five years of probation.

The petitioner filed a petition for a writ of habeas corpus in 2020. He later filed an amended petition on October 24, 2022, alleging that his due process rights were violated by the state's failure to disclose to him, in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83, a search warrant for Drobnak's cell phone records that contained otherwise undisclosed impeachment evidence concerning Drobnak, specifically, that he had refused to cooperate with law enforcement officers between the date of his and the petitioner's arrests in this case and the start of the petitioner's criminal trial.

To provide context for the petitioner's *Brady* claim, we preliminarily note the following relevant legal principles. "The prosecution's duty to disclose under *Brady* applies not only to exculpatory evidence but also to impeachment evidence, which is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . . To prove a *Brady* violation, the petitioner must establish: (1) that the state suppressed evidence (2) that [the suppressed evidence] was favorable to the defense and (3) [that such evidence was] material either to guilt or to punishment. . . . If the petitioner fails to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 221 Conn. App. 294, 304, 301 A.3d 1136 (2023).

"The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose

evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . .” (Internal quotation marks omitted.) *State* v. *Bryan*, 193 Conn. App. 285, 317, 219 A.3d 477, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019). In other words, “[u]nder the last *Brady* prong, the prejudice that the defendant suffered as a result of the impropriety must have been material to the case, such that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . If . . . [the petitioner] . . . fail[s] to meet his burden as to [any] one of the three prongs of the *Brady* test, then [the court] must conclude that a *Brady* violation has not occurred.” (Citations omitted; internal quotation marks omitted.) *State* v. *Rosa*, 196 Conn. App. 480, 498, 230 A.3d 677, cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020).

The habeas court recounted the following additional factual and procedural information in its memorandum of decision denying the petitioner’s habeas petition. “At the habeas trial, [Lynch] testified that he searched for Drobnak after he failed to appear in court on his narcotics possession charge that stemmed from the incident involving the petitioner. As part of his search efforts, [Lynch] filed an affidavit and application for a search warrant—the search warrant in question—for Drobnak’s cell phone. The search warrant, dated October 3, 2018, detailed the following pertinent information. Drobnak had active arrest warrants for failing to appear in the narcotics case in New London and a case in Derby where Drobnak faced a sixth degree larceny charge. An additional arrest warrant was issued for Drobnak for a violation of probation that resulted after he was arrested for third degree burglary. New London, New Haven, Torrington, Derby, Redding, Milford, and Connecticut State Police Departments were unable to locate

Drobnak to serve the warrants. In August, 2018, Drobnak was stopped by [officers from] the New Haven Police Department while operating a motor vehicle. Drobnak provided the police with a false name and eluded apprehension on the arrest warrants. In late September, 2018, Drobnak contacted [Lynch] by cell phone and informed him that he would not turn himself in to the police. The search warrant further noted that Drobnak is a material witness in the petitioner's trial scheduled to begin during the week ending October 12, 2018, and the production of Drobnak's cell phone records would be material and relevant information for the police in determining his whereabouts. The record indicates that Drobnak was subsequently taken into custody and testified at the petitioner's criminal trial. . . . Drobnak testified at the habeas trial that he was an active drug user and on the run from the police prior to testifying in the petitioner's criminal trial. Drobnak testified that during this time he spoke to the New Haven police and provided them with the fake name 'Brian Rivers' because he did not want to go to jail.''

In rejecting the petitioner's claim, the habeas court determined that the first two prongs of *Brady*, requiring proof that the state failed to disclose evidence favorable to the petitioner, had been satisfied, but that the third prong, requiring proof that the undisclosed evidence was material to guilt or to punishment, had not. Concerning the third prong of *Brady*, the habeas court explained that "[t]he information contained in the search warrant indicated that Drobnak gave the police a false name and evaded arrest for several months prior to the petitioner's trial. At the petitioner's criminal trial, the petitioner cross-examined Drobnak on his convictions and pending charges, including his charges for failing to appear. The petitioner also asked Drobnak how long it took him to show up to court, and Drobnak testified that he was homeless, taking drugs and on the

run for almost a year prior. The court finds that the petitioner effectively cross-examined Drobnak regarding his evading arrest before the petitioner's trial and thus the only undisclosed impeachment evidence was the fact that Drobnak gave a fake name to the police during a motor vehicle stop."

The court ultimately concluded that, "in the context of the entire record, the petitioner failed to meet his burden of proving that there is a reasonable probability that, had the state disclosed the search warrant, the outcome of the petitioner's criminal trial would have been different. The petitioner's conviction did not hinge entirely on Drobnak's testimony, and the undisclosed impeachment information contained in the search warrant—namely, the fact that Drobnak gave the police a fake name while he was on the run—would not have undermined his testimony to a significant degree beyond what the petitioner accomplished on cross-examination." The habeas court later granted the petitioner's petition for certification to appeal. This appeal followed.

We begin by noting that the first two prongs of *Brady* are not at issue in the present appeal. With that in mind, we note the following additional relevant legal principles regarding the third prong of *Brady,* requiring proof of materiality. "[M]ateriality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error." *State* v. *Rosa,* supra, 196 Conn. App. 500–501. "The test for materiality is whether the suppressed evidence in the context of the entire record creates a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . [T]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish materiality in

the constitutional sense. . . . The question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . . [W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, supra, 221 Conn. App. 304–305.

"A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. . . . Accordingly, the focus is not whether, based [on] a threshold standard, the result of the trial would have been different if the evidence had been admitted. We instead concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict. . . . Put differently, materiality is established if the withheld evidence is of sufficient import or significance in relation to the original trial evidence that it reasonably might give rise to a reasonable doubt about the petitioner's guilt." (Citation omitted; internal quotation marks omitted.) *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 263, 112 A.3d 1 (2015).

In this appeal, the petitioner claims that the habeas court incorrectly determined that the undisclosed information set forth in the search warrant for Drobnak's cell phone records was not material under *Brady* v. *Maryland*, supra, 373 U.S. 87. It was in fact material, the petitioner contends, because without it he could not cross-examine Drobnak, a key state's witness upon whose credibility the state's entire case allegedly depended, about his active lying to police in the months following his arrest for possession of narcotics stemming from this incident—particularly, about his use of a fake name during an unrelated motor vehicle stop to avoid being taken into custody on outstanding arrest warrants for failure to appear.[2] We disagree.

"[W]hen the prosecution's case hinges entirely on the testimony of certain witnesses, information affecting their credibility is material. . . . The fact that the witness' testimony is corroborated by additional evidence supporting a guilty verdict also may be considered in determining whether the suppressed impeachment evidence was material. . . . [W]ithheld impeachment evidence may not be material when the witness' credibility and motives for testifying already had been impeached via defense counsel's comprehensive and skillful cross-examination . . . [and the witness'] testimony, while significant, was not dispositive . . . . If the evidence in question would not have provided the [petitioner] with any significant impeachment material that was not already available and used by him . . . it is immaterial under *Brady*. This is true even if the [evidence's] cumulative effect may have lent some additional support to the [petitioner's] attack on [a witness]." (Citations omitted; internal quotation marks omitted.) *Williams*

---

[2] The petitioner also contends, without much elaboration, that the trial court "overstate[d] the petitioner's burden." The habeas court's decision, in which it accurately cites the law pertaining to materiality under *Brady*, belies this argument.

v. *Commissioner of Correction*, supra, 221 Conn. App. 315–16.

With these principles in mind, we question first, whether the undisclosed impeachment evidence would have provided the petitioner with any significant impeachment material that was not already available and used by him to cross-examine Drobnak at his criminal trial, and second, if such previously undisclosed evidence would have provided the petitioner with significant new impeachment material, whether Drobnak's original trial testimony played such a significant role in supporting the state's case against the petitioner at trial that reconsideration of that testimony in light of the new impeachment material reasonably might be taken to put the whole case in such a different light as to undermine confidence in the jury's guilty verdict.

In answer to the first question, we conclude that the undisclosed search warrant for Drobnak's cell phone records would not have provided the petitioner with any significant impeachment material that was not already available to and used by him to cross-examine Drobnak at his criminal trial. On direct examination, Drobnak testified that he had called the petitioner by telephone in order to purchase crack cocaine, then met him at the Gulf station, got into his car, and purchased $50 worth of crack cocaine from him. On cross-examination, the petitioner challenged this testimony by eliciting several admissions from Drobnak: first, that he initially identified another man as the person who allegedly sold him crack cocaine on the day of the petitioner's arrest, having done so by selecting the other man's photo from a photographic lineup shown to him by the police; second, that in his written statement to the police following his arrest, he referred to the person who allegedly sold him crack cocaine on that day as "G," a nickname he knew to be that of a different man named Greg Williams, although Drobnak claimed that

by using that nickname, he intended to identify the petitioner as the drug seller; third, that when he was interviewed by the police following his arrest for possession of narcotics in connection with this incident, he falsely told them that he always showed up in court for his scheduled court appearances, although he previously had failed to appear in court when required to do so and had been criminally charged on those occasions with failure to appear; and fourth, that while he was out on bail following his arrest for possession of narcotics, he failed to appear and then was "on the run for a year because [he] was getting high." Such admissions were clearly elicited by the petitioner on cross-examination to raise doubts both as to Drobnak's general credibility as a witness, based upon his long-term drug abuse and his repeated willingness to lie to and otherwise frustrate the efforts of law enforcement authorities, and as to the truthfulness of his specific claim in this case that the petitioner had sold him crack cocaine when they met together at the Gulf station parking lot on the day of his and the petitioner's arrests.

Against this background, although the undisclosed evidence of Drobnak's giving a fake name to police in the course of an unrelated motor vehicle stop undoubtedly would have cast further negative light on Drobnak's general credibility as a witness, it in no way is related to and thus did not contradict the substance of his specific account of purchasing crack cocaine from the petitioner during their police monitored meeting at the Gulf station parking lot on the day in question. Not only did the subject motor vehicle stop not concern that earlier meeting and alleged drug purchase, but it was conducted by different police officers, from a different town and police department, for reasons other than those that led to the investigation in this case.

The undisclosed evidence described dishonest conduct by Drobnak that, if he had admitted to it in

response to further cross-examination by the petitioner, could have affected Drobnak's general credibility as a witness by showing him to be a person who was willing to lie to the police. As such, it was merely additional evidence of Drobnak's untruthfulness in dealing with law enforcement personnel, particularly his denial of prior failures to appear in court and his misidentification of the person who had sold him crack cocaine on the day of his and the petitioner's arrests. It was therefore not material for purposes of establishing a *Brady* violation because, even if it had been disclosed to the petitioner and he had been permitted, in the court's discretion, to cross-examine the witness about it,[3] Drobnak's further admission of such conduct would have lent only "incremental" support to the petitioner's claim that he was not a credible witness and, thus, that his testimony should not be relied on as a basis for finding the petitioner guilty. *State* v. *Floyd*, 253 Conn. 700, 746, 756 A.2d 799 (2000); see also id. (suppressed impeachment evidence was not material under *Brady* where it was merely incremental in value because jury had already been apprised of witness' motivation for testifying falsely for state and substance of witness' testimony was corroborated by other evidence).

---

[3] Even if Drobnak's arrest warrant had been disclosed and the petitioner had been allowed, at the discretion of the trial court; see *Martyn* v. *Donlin*, 151 Conn. 402, 408, 198 A.2d 700 (1964); to cross-examine him regarding whether he had ever given a false name to the police, the petitioner would have had to accept Drobnak's answer and could not have admitted at trial the extrinsic evidence of Drobnak's arrest warrant. "[T]he only way to prove misconduct of a witness for impeachment purposes is through examination of the witness." (Internal quotation marks omitted.) *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 128, 124 A.3d 501 (2015); see also Conn. Code Evid. § 6-6 (b) (2); *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013) ("[A] witness may be cross-examined about specific acts of misconduct that relate to his or her veracity. . . . First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, extrinsic evidence of such acts is generally inadmissible." (Citations omitted; internal quotation marks omitted.)).

Furthermore, even though the undisclosed evidence could have cast doubt on the general credibility of Drobnak, it was not of such significance, in the context of all the evidence adduced at trial, that it might reasonably have raised a reasonable doubt about the truthfulness of Drobnak's testimony that he purchased crack cocaine from the petitioner in this case, or thus undermined confidence in the jury's guilty verdict. This is so because, although Drobnak's testimony that he purchased crack cocaine from the petitioner while they sat together in the petitioner's car was directly relevant to the state's claim that the petitioner possessed narcotics with the intent to sell, the principal basis upon which the state sought to confirm the truthfulness of such testimony was not Drobnak's general credibility, but rather inferences supporting the reliability of his inculpatory testimony based upon the testimony of several experienced police officers about the consistency of Drobnak's and the petitioner's conduct, as the officers observed it before, during and after their meeting in the Gulf station parking lot, with that of buyers and sellers of illegal drugs. Given the persuasive force of such unchallenged confirmatory evidence in support of the truthfulness of Drobnak's testimony against the petitioner, even far more persuasive evidence of Drobnak's lack of general credibility than that furnished by the contents of the previously undisclosed search warrant for Drobnak's cell phone records could not reasonably have placed the state's entire case against the petitioner in such a different light as to undermine confidence in the jury's guilty verdict. Instead, we conclude that, because there was such overwhelming evidence presented at the petitioner's criminal trial to corroborate Drobnak's testimony that the petitioner sold him crack cocaine when they met at the Gulf station on the day in question, and thus that the petitioner possessed narcotics with intent to sell, the undisclosed

evidence of Drobnak's giving a fake name to police to avoid being arrested during an unrelated motor vehicle stop does not satisfy the test for materiality under the third prong of the *Brady* test.

To begin with, there was no question that the petitioner was present at the Gulf station on the day and time in question, as he admitted at his criminal trial that he met there briefly with Drobnak in his Toyota, even though he offered a different explanation for their meeting. This fact, moreover, was confirmed by the testimony of several investigating officers, who described what they observed as follows.

Lynch testified that he, along with Zelinski, Griffin, and Pelchat, conducted surveillance of a Gulf station in New London known for narcotics trafficking. Lynch explained that he noticed Drobnak at the Gulf station pacing back and forth near a Volvo sedan while on and off his phone, failing to get gas, failing to enter the convenience store, and failing to use the air pressure machine near where his Volvo was parked. He explained that narcotics investigators learn in "narcotics 101, [their] basic training, [that when] . . . someone . . . is at a convenience store that is not going in to get gas, not going in to buy anything, not entering the store . . . that person is there to wait for someone to purchase narcotics."

Lynch testified that he then observed a dark blue Toyota Camry operated by the petitioner drive into the Gulf station and stop alongside the Volvo. Drobnak then entered the petitioner's vehicle and remained in the front passenger seat for less than one minute before exiting the vehicle and getting back into his Volvo. Lynch further explained that this conduct was significant to him as a narcotics investigator because in "basic narcotics investigations—someone enters the vehicle,

exchanges money for narcotics, and then quickly exits the vehicle."

Upon approaching Drobnak's vehicle at the Gulf station, moreover, Lynch observed Drobnak sitting in the driver's seat holding in his lap a white, rocklike substance, which returned a positive field test for crack cocaine, poking at it with the ink cartridge of a ballpoint pen. Lynch explained that in his "training and experience [Drobnak] was poking at [the rocklike substance] to break it into pieces so you don't smoke it all at once; you don't use it all at once." That observation, in turn, supported Drobnak's initial statement to Lynch, as repeated in his trial testimony, that he had just purchased crack cocaine from the petitioner when Lynch approached him as he sat in his car after the petitioner drove out of the Gulf station parking lot, not only because the rocklike substance field tested positive for crack cocaine, but because at the time of the officer's observation, the crack cocaine had not yet been broken apart and made ready for personal use. Lynch further testified that, after arresting Drobnak and advising him of his *Miranda* rights, Drobnak not only described his purchase of the crack cocaine from the petitioner, but gave him the phone number he had called to arrange for that purchase. Lynch, in turn, gave that phone number to Pelchat who, along with Griffin, had followed the petitioner's car out of the Gulf station.

Griffin testified similarly concerning the activities of the petitioner and Drobnak at the Gulf station. He further testified that he and Pelchat followed the petitioner's Toyota as it left the Gulf station parking lot. After being informed that Drobnak had been found in possession of narcotics and had been placed under arrest, Griffin requested a marked police vehicle to assist in stopping the petitioner's vehicle. Griffin further explained that Moreau attempted to initiate a motor

vehicle stop, but the petitioner continued to drive forward. Griffin explained that he "was concerned that, although he was maintaining a slow roll, that he was beginning the decision-making process of pursuing and fleeing" and that another concern "was that he was not initially stopping as most people do to buy himself time to conceal the narcotics . . . ." Griffin further testified that, after the petitioner finally stopped his vehicle, he searched the petitioner for weapons and "felt a bulge in [the petitioner's] pocket," which turned out to be $1268 in cash, an amount sufficient in these circumstances to suggest to him that the cash constituted the proceeds of drug sales.

Lynch further testified that after he arrested and spoke with Drobnak, he kept in contact with Pelchat, whom he informed that Drobnak had given him the phone number of the person who had sold him the crack cocaine. Pelchat testified that after he received this information from Lynch, Lynch called the seller's number as Drobnak had reported it to him and Pelchat saw Lynch's phone number come up on the unclaimed LG phone that had been found inside the petitioner's Toyota. Griffin testified that when he asked the petitioner if the LG phone belonged to him, the petitioner responded that he was "not willing to say, and that it wasn't his first rodeo." Later, however, when Lynch asked the petitioner why he was involved in selling narcotics, the petitioner responded, "That's all I know."

In view of the previously described testimony from the investigating officers, we conclude that there is no reasonable probability that the outcome of the petitioner's criminal trial would have been different if the state had disclosed the search warrant for Drobnak's phone to the petitioner and he had used the impeachment evidence in it to cross-examine Drobnak about giving a fake name to police during an unrelated motor vehicle

stop. Not only was the undisclosed impeachment evidence not qualitatively different from the other impeachment evidence elicited by the petitioner at his trial, and thus of no great significance in challenging Drobnak's general credibility, but even if it could be found to support a finding that Drobnak had very poor general credibility, any weakness in general credibility established by it was so convincingly overcome by evidence from police investigators confirming the truth of Drobnak's inculpatory testimony against the petitioner that the new impeachment evidence cannot reasonably be found to have given rise to a reasonable doubt about the petitioner's guilt. See *William B.* v. *Commissioner of Correction*, 128 Conn. App. 478, 486, 17 A.3d 522 ("Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality [under *Brady*] is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." (Internal quotation marks omitted.)), cert. denied, 302 Conn. 912, 27 A.3d 371 (2011); see also *State* v. *Bryan*, supra, 193 Conn. App. 318–20 (undisclosed impeachment evidence was not material even if defendant could have used records to impeach credibility of state's witness, when overwhelming evidence was adduced at trial supporting the defendant's conviction). We therefore conclude that the undisclosed impeachment evidence was not material to guilt or to punishment under the third prong of *Brady*, and thus that the habeas court properly rejected the petitioner's *Brady* claim.

The judgment is affirmed.

In this opinion the other judges concurred.